UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PROBATTER SPORTS, LLC, | : | |
| | : | |
| Plaintiff, | : | No. 3:05-CV-1975 (VLB) |
| | : | |
| v. | : | |
| | : | March 29, 2019 |
| SPORTS TUTOR, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF DECISION ON MOTION TO EXCLUDE ALL EVIDENCE
AND ARGUMENT CONCERNING DAMAGES [DKT. 511]**

Plaintiff ProBatter Sports, LLC ("ProBatter") brings this patent infringement action against Defendant Sports Tutor, Inc. ("Sports Tutor"). The Court granted summary judgment in ProBatter's favor on the question of infringement and thereafter conducted a five-day bench trial on the questions of invalidity and relief finding in ProBatter's favor again. The case proceeded to the damages phase and the parties commenced damages discovery. Before the Court is Sports Tutor's Motion to Exclude All Evidence and Argument Concerning Damages. Sports Tutor argues that the Court should preclude all evidence and argument on damages because ProBatter failed to produce a royalty-free license to Sports Tutor in discovery and purposefully failed to disclose its existence in response to direct questioning by the Court. For the foregoing reasons, Sports Tutor's Motion is GRANTED IN PART AND DENIED IN PART.

## Procedural and Factual Background

ProBatter initially disclosed lost profits as the measure of damages. Nearly seven years later and long after the close of discovery, ProBatter disclosed reasonable royalty as the measure of damages in its proposed findings of fact and conclusions of law, submitted in conjunction with the joint trial memorandum. In a hearing on Sports Tutor's objection to changing the measure of damages, ProBatter represented to the Court that it granted only one license which was to third-party Joyner Technologies. ProBatter produced this license to Sports Tutor. Three years ago, on March 23, 2016, this Court denied Sports Tutor's motion to preclude evidence of a reasonable royalty to prove damages and ruled that all interests would be best served by providing Sports Tutor with two additional months to conduct discovery on damages measured by the reasonable royalty and ProBatter one month to conduct discovery only with respect to the new evidence. [Dkt. No. 469 (Mem. of Decision)].

More than two years after the Court's order, in April 2018, Sports Tutor issued a subpoena to Sports Attack, LLC ("Sports Attack") and deposed its corporate representative, Amanda Pratt, the following month. Sports Attack produced an agreement between ProBatter and Sports Attack dated October 21, 2008 (the "2008 Agreement"). Sports Tutor now maintains that ProBatter was dishonest in its representations to the Court because the 2008 Agreement is a royalty-free license to Sports Attack. Sports Tutor also argues that ProBatter purposefully failed to produce the 2008 Agreement in discovery. It claims that ProBatter only produced the 2008 Agreement when it realized that Sports Attack

would produce the document in response to Sports Tutor's subpoena. As a sanction for ProBatter's conduct, Sports Tutor asks the Court to exclude all evidence and argument concerning damages.

Sports Tutor argues that ProBatter had no excuse for failing to disclose this relevant and comparable license. Sports Tutor claims that it suffered added costs and unnecessary litigation risks as a result of ProBatter's conduct. In response, ProBatter claims that its damages case cannot be excluded because it had no obligation to disclose the 2008 Agreement. ProBatter argues that the 2008 Agreement is not a binding and enforceable license under Connecticut law because it was subject to entering into a formal agreement and the parties did not take such action until July 2018.

The issue before the Court therefore is whether the agreement ProBatter entered into with Sports Attack which ProBatter failed to disclose and told the Court did not exist was a license agreement.

The first paragraph of the 2008 Agreement states:

This will outline our relationship with respect to joint collaboration on Sports Attack's programmable, 3 wheel pitching machine currently in development ("the E-Hack Attack Machine") and its adaption for use in combination with a ProBatter video conversion system ("the ProBatter Video Kit"). The following general terms are intended to be the basis for a formal agreement between ProBatter Sports and Sports Attack, LLC. In the interim, however, this letter shall [*sic*] it be construed as a binding agreement.

The following paragraph discusses the consulting arrangement between the parties and their respective rights and obligations:

ProBatter will provide Sports Attack with reasonable consulting services to further its development of the Programmable Hack Attack machine and facilitate its adaptation with the ProBatter Video Kit.

Such services will include, but not be limited to, consulting provided by ProBatter's engineering department and outside programmers and control engineers as well as access to ProBatter's object and source codes and databases for different pitches. ProBatter will not charge Sports Attack for engineering time provided by internal ProBatter engineering and test personnel but if the use of ProBatter's outside engineering consultants and programmers are required, Sports Attack shall pay for the actual cost of such consultants and programmers subject, of course, to prior written approval by Sports Attack. ProBatter engineering agrees to make an annual trip to Nevada to work with Sports Attack at ProBatter's own cost and expense but if additional trips are required, Sports Attack shall reimburse ProBatter for any reasonable travel expenses associated therewith. All rights in and to the work performed by ProBatter on or in conjunction with the E-Hack Attack Machine relating to non-video technology shall be deemed owned by Sports Attack. In that connection, ProBatter will, without any requirement of further consideration, assign any right, title, or interest it may have or claim to have in such work product to Sports Attack and will take such further actions, including the execution and delivery of instruments of conveyance, as may be appropriate to protect Sports Attack's rights in such work product. However, ProBatter shall be deemed to own all right, title and interest in and to video technology. In that connection, Sports Attack will, without any requirement of further consideration, assign any right, title, or interest it may have or claim to have in such work product to ProBatter and will take such further actions, including the execution and delivery of instruments of conveyance, as may be appropriate to protect ProBatter's rights is [*sic*] such work product.

The next paragraph states:

For so long as the parties are working together, ProBatter shall grant Sports Attack a royalty free license under its US and international patents for programmable pitching machines subject to entering into an appropriate license agreement. ProBatter agrees to take reasonable steps to enforce its right in such patents against third party infringers.

In the final two paragraphs, the parties agree that Sports Attack shall sell the E-Hack Attack Machine to ProBatter at its lowest dealer or "favored customer price." The parties also state that Sports Attack intends for ProBatter to be its exclusive video customer for at least two years subject to certain terms and during

the exclusivity period Sports Attack agrees not to sell the E-Hack Attack Machine to any entity that it knows or has reason to know intends to incorporate a video conversion kit with such E-Hack Attack Machine.

## Analysis

A.  The Parties Intended to be Bound by the 2008 Agreement.

The threshold issue is whether the 2008 Agreement is binding. The Court considers the general rules of contract interpretation and the law surrounding license agreements to determine whether the parties intended to be bound by the 2008 Agreement. The Connecticut Appellate Court recently recited the well-established principles of contract construction:

> The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . In contrast, a contract is unambiguous when its language is clear and conveys a definite and precise intent . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous.

*Nationwide Mut. Ins. Co. v. Allen*, 83 Conn. App. 526, 537–38 (2004) (internal citations and quotation marks omitted). While *Nationwide* was an insurance contract case, the principles espoused by the court are applicable to all contracts:

> A contract will be read as a whole and every part will be read with reference to the whole. If possible, the contract will be so interpreted as to give effect to its general purpose as revealed within its four corners or in its entirety. This principle governing contract interpretation has been applied along with other similar rules.
>
> To the extent possible, and except to the extent that the parties manifest a contrary intent, by stating, for example, that recitals or headings are not to be considered or given effect in determining the meaning of their agreement, every word, phrase or term of a contract must be given effect. An interpretation which gives effect to all provisions of the

> contract is preferred to one which renders part of the writing superfluous, useless or inexplicable. A court will interpret a contract in a manner that gives reasonable meaning to all of its provisions, if possible.

11 Williston on Contracts § 32:5 (4th ed.). Most recently, the Connecticut Supreme Court stated that when determining the meaning of contract language, courts must:

> first attempt to ascertain the parties' intent from the language they used in their contract, looking at the contract as a whole and giving the contract's words their ordinary meaning and one that renders its provisions consistent.

*C and H Elec., Inc. v. Town of Bethel*, 312 Conn. 843, 853 (2014) (internal citations omitted). In essence, the Court must reconcile all the language of the 2008 Agreement giving meaning to all of its terms.

Under Connecticut law, "[w]hether the parties intended legally to bind themselves prior to the execution of a formal contract is to be determined from (1) the language used, (2) the circumstances surrounding the transaction, and (3) the purpose that they sought to accomplish*.*" *Friedman v. Donenfeld*, 92 Conn. App. 33, 39–42 (2005) (internal citations and quotation marks omitted) (affirming the trial court's decision that the parties' memorandum memorializing a property owner's agreement to give prospective sellers a six-month option to purchase the property was not an enforceable contract because it was a binder toward an option to purchase subject to a contract signing, it was signed under spontaneous circumstances without counsel and its purpose was not to enter into a binding contract). "A consideration of these elements enables a court to determine if the informal contract . . . is enforceable or simply an intention to negotiate a contract in the future." *Id.*

**The Court finds that the plain language of the 2008 agreement makes clear the parties did intend to enter into a binding license agreement in 2008. The 2008 Agreement expressly states "this letter shall it [*sic*] be construed as a binding agreement." The fact that it also states the parties intended to enter into a more formal agreement does not undermine that clear and unequivocal expression of the parties' intent to bind themselves in that it states:**

> **For so long as the parties are working together, ProBatter shall grant Sports Attack a <u>royalty free license</u> under its US and international patents <u>for programmable pitching machines subject to entering into an appropriate license agreement.</u> ProBatter agrees to take reasonable steps to enforce its right in such patents against third party infringers. (Emphasis added.)**

**The parties clearly expressed their intent that the agreement convey an immediate license without any conditions precedent. Like *Bender v. Bender*, cited by Sports Tutor, the 2008 Agreement contains no language indicating that any portion of the agreement was conditional or subject to a certain condition. 292 Conn. 696, 726 (2009).**

**The next question is whether this equivocal language undermines the finality of the language granting a license. It does not; first, because the 2008 Agreement expressed the parties' intent to commence performance of the Agreement before a more appropriate agreement is reached. Second, the express terms of the 2008 Agreement clearly state what ProBatter intends to convey to Sports Attack and what Sports Attack intends to convey to ProBatter in return. It says ProBatter is granting Sports Attack the immediate use of its patented technology, including its proprietary information and assistance necessary to understand and exploit it. The 2008 Agreement states:**

7

> ProBatter will provide Sports Attack with reasonable consulting services to further its development of the Programmable Hack Attack machine and facilitate its adaptation with the ProBatter Video Kit. Such services will include, but not be limited to, consulting provided by ProBatter's engineering department and outside programmers and control engineers as well as access to ProBatter's object and source codes and databases for different pitches.

In furtherance of their joint venture to develop a video-equipped ball pitching machine ProBatter also agreed:

> All rights in and to the work performed by ProBatter on or in conjunction with the E-Hack Attack Machine relating to non-video technology shall be deemed owned by Sports Attack. In that connection, ProBatter will, without any requirement of further consideration, assign any right, title, or interest it may have or claim to have in such work product to Sports Attack and will take such further actions, including the execution and delivery of instruments of conveyance, as may be appropriate to protect Sports Attack's rights in such work product.

ProBatter reserved for itself "all right, title and interest in and to video technology" alone. In consideration, Sports Attack agreed:

> Sports Attack will, without any requirement of further consideration, assign any right, title, or interest it may have or claim to have in such [video technology] work product to ProBatter and will take such further actions, including the execution and delivery of instruments of conveyance, as may be appropriate to protect ProBatter's rights is [*sic*] such work product.

As explained in detail below, the purpose and circumstances surrounding the 2008 Agreement indicate that ProBatter intended to grant Sports Tutor a royalty-free license prior to entering into a formal license agreement inn consideration for the mutual covenants. Therefore, the ProBatter and Sports Attack intended to be bound by the 2008 Agreement.

### B. The 2008 Agreement Is a License Agreement.

The Court must next determine whether the 2008 Agreement is a license agreement. Black's Law dictionary defines a license as "[a] permission, [usually] revocable, to commit some act that would otherwise be unlawful." *License*, Black's Law Dictionary (10th ed. 2014). Monetary compensation is not required for an agreement to be a license. For example, a "cross-license is "[a]n agreement between two or more patentees to exchange licenses for their mutual benefit and use of the licensed products." *Cross-license*, Black's Law Dictionary (10th ed. 2014). Monetary payment is also not required for an implied-license which is "[a] royalty-free license arising from a property owner's conduct regarding another person's use of the property even though the owner has not expressly consented to the property's use." *Implied License*, Black's Law Dictionary (10th ed. 2014).

"In the patent context, for example, the circumstances surrounding the conduct give rise to an affirmative grant of consent or permission to infringe a patent's claims. For example, the conduct of a patentee who encourages the manufacture of infringing products may be construed as an implied license to use the patent. An implied license may also arise when a patentee authorizes the sale or express grant of a license to a buyer, who then resells the license to a third party; the third party is the patentee's implied licensee." *Id.*; *see also Implied license by conduct*, Black's Law Dictionary (10th ed. 2014) ("An implied license based on the patentee's course of conduct, including language, from which another person could properly infer that the patentee consented to the other's use of the patent.").

Here, the circumstances clearly indicate that the 2008 Agreement is both a cross-license and an implied license. First, ProBatter and Sports Tutor agreed to collaborate in the development of a ball pitching machine each employing their proprietary and in ProBatter's case, patented technology. The 2008 Agreement is a cross-license because it facilitated the parties' agreement to jointly develop a pitching machine for use with ProBatter's video system.

Because the subject of the 2008 Agreement, namely the E-Hack Machine, was in development, the parties could not quantify the value of the technology transfer. The parties' statement that they intended to enter into an appropriate agreement in the future is consistent with their intent to determine the value of the technology transfer after their collaboration matured and produced a marketable product. Only then could they ascertain the value of their contributions to the collaboration and ascertain a reasonable royalty.

Alternatively, the 2008 Agreement is an implied license because ProBatter granted Sports Attack a broad royalty-free license prior to entering into a formal license agreement. The 2008 Agreement does not clearly authorize Sports Attack to use dynamic breaking, but in it ProBatter's conveys access to its technology, including its in-house consulting engineers, outside programmers, and control engineers as well as access to ProBatter's object and source codes and databases for different pitches. ProBatter also consented to the sale of the licensed technology by Sports Attack to third parties. Sports Attack sold over one million dollars' worth of the E-Hack Attack machine employing dynamic braking. This

broad grant of authority to use ProBatter's technology creates an implied license to the extent the 2008 Agreement does not create an express license.

ProBatter argues it did not know the Sports Attack ball pitching machine used dynamic braking. A former ProBatter employee who worked on the E-Hack machine with Sports Attack testified that he had no knowledge that the machine used dynamic braking because the focus of the project was to "put a video screen on [the] front of the e-Hack Attack machines" and he had "not taken the covers off [the machine] to see what is actually in there." [Dkt. 517-2 (M. Suba Dep.) at 18-22]. While the deponent may not have known, it is incredulous that no one at ProBatter knew given the fact that ProBatter agreed to travel to Nevada at least once a year to collaborate on the development of the machine. It is also incredulous because ProBatter's engineering department, outside programmers, and control engineers were committed to work on developing the machine with the use of ProBatter's object and source codes and databases for different pitches. Moreover, it is inconceivable that ProBatter could enter into an "appropriate" agreement if it had no knowledge of how its technology transfer was being used and whether and to what extent it was incorporated into the machine it was jointly developing with Sports Attack.

Sports Attack's Ms. Pratt testified that ProBatter approached Sports Attack because "their core competency was not making pitching machines" and "they wanted to secure another pitching machine with a company who would affordably make them and was in the business, and so [ProBatter] approached [Sports Attack] to be that company." [Dkt. 510-2 (A. Pratt Dep. at 23:12-25)]. ProBatter required "a

machine that was electronic and would automate the changing of the pitch." *Id.* at 23:24-24:2. Ms. Pratt testified that Sports Attack's E-Hack machine used Probatter's dynamic braking technology, but Sports Attack did not have a license or pay a royalty. [Dkt. 510-2 (A. Pratt Dep.)]. Ms. Pratt also testified that Sports Attack did not expect an infringement action from ProBatter because they developed the E-Hack Attack machine together. [Dkt. 519-1 (A. Pratt Dep.)]. Her testimony is further support for the conclusion that the 2008 Agreement was a license agreement. In general, a license is not a property interest at all, but merely a permission to act or, conversely, a covenant not to sue for such action. *See Harris v. Emus Records Corp.*, 734 F.2d 1329, 1334 (9th Cir. 1984). As stated by the U.S. Supreme Court in the context of a patent license, a license is "a mere waiver of the right to sue." *General Talking Pictures Corporation v. Western Electric Co.*, 304 U.S. 175, 181 (1938), *aff'd on reh'g*, 305 U.S. 124 (1938) (*quoting De Forest Radio Telephone & Telegraph Co. v. U.S.*, 273 U.S. 236, 242 (1927)). Even if couched as the "right" to conduct action, the license agreement is construed as a promise not to sue. *Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987). That is exactly what Ms. Pratt stated ProBatter did, allow Sports Attack to use dynamic breaking without paying a license fee during their collaboration on the E-Hack marching in return from the benefits of sports Attack's technology.

For the foregoing reasons, the Court finds that the 2008 Agreement was a license agreement that ProBatter failed to disclose.

C. **Sanction for ProBatter's Failure to Disclose the 2008 Agreement.**

Now that the Court has found that it was unreasonable for ProBatter to withhold the 2008 Agreement, it must determine the appropriate sanction. Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard may impose other appropriate sanctions." *Id.* at 37(c)(1)(C). Appropriate sanctions include prohibiting the disobedient party from supporting or opposing designated claims or defenses, striking pleadings, and dismissing the action or proceeding in whole or in part. *Id.* at (b)(2)(A)(i)–(vi). Before awarding exclusion, the Court must consider: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (alterations omitted) (citing *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)). Bad faith is not required before awarding exclusion, but "it can be taken into account as part of the party's explanation for its failure to comply." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).

As the Court explained above, ProBatter provides no reasonable explanation for its failure to disclose the 2008 Agreement. Next, the Court considers the importance of the 2008 Agreement and the prejudice to Sports Tutor of ProBatter's failure to disclose it to the Court. The Court again finds the 2008 Agreement was a valuable license. Sports Attack undertook the development of a new ball pitching machine in consideration for the transfer of ProBatter's technology. Research and development has intrinsic value. Because it requires a commitment of resources, which are quantifiable, it would generally only be undertaken when it is perceived to have value in excess of the investment.

In addition, Sports Attack provided ProBatter immediate consideration for its technology transfer.

> Sports Attack shall sell the E-Hack Attack Machine to ProBatter at its lowest dealer or "favored customer price." The parties also state that Sports Attack intends for ProBatter to be its exclusive video customer for at least two years subject to certain terms and during the exclusivity period Sports Attack agrees not to sell the E-Hack Attack Machine to any entity that it knows or has reason to know intends to incorporate a video conversion kit with such E-Hack Attack Machine

The discount and exclusivity negotiated and memorialized in the 2008 Agreement have measurable value. Now that the E-Hack machine has been developed and successfully marketed, the value of the technology transfer is ascertainable. It remains to be seen whether the 2018 License Agreement between ProBatter and Sports Attack is a credible measure of that value.

ProBatter failed to disclose to Sports Tutor information relating to the 2008 Agreement and identify a witness with knowledge about the agreement as required by Federal Rule of Civil Procedure 26(a) and (e). The Court has the option of not

allowing it to use the 2008 Agreement or imposing other appropriate sanctions. The Court cannot determine on the current record the appropriate sanction. As previously noted, denial of damages is a harsh sanction relegated to the worst offenders.

The Court cannot determine the extent to which concealment of the 2008 Agreement appreciably effected the reasonable royalty calculation. Based on the current record, the joint venture had some value to ProBatter and that value is quantifiable and can be extrapolated into a royalty rate. However, as the court has stated previously, the probative value of a royalty rate negotiated after infringement ceased is questionable. If the purpose of damages is to compensate a patentee for infringement, then there should be some temporal proximity between the infringement and the licenses on which a reasonable royalty is calculated—if for no other reason than to account for the fact that market conditions change over time. *See, e.g., Small v. Nobel Biocare USA, LLC*, 808 F. Supp. 2d 584, 588-89 (S.D.N.Y. 2011) (A reasonable royalty can be calculated from a hypothetical negotiation between the patentee and infringer which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement *just before infringement began*") (internal citations and quotation marks omitted) (emphasis added).

In addition, measuring damages based on a license between the patentee and a third party with which the patentee has a business relationship involving the patent seems unreliable and poses the potential of collusion and inflation. It would seem that a reasonable royalty preferably should be based on arm's length

negotiations where the intrinsic value of the licensed technology is the sole or primary motivation. Thus, it is not clear to the court that either the 2008 or the 2018 license agreements between Sports Attack and ProBatter are credible bases to calculate a reasonable royalty.

Accordingly, the parties are ordered to meet and confer and advise the Court if they can reach an agreement on the inclusion or exclusion of the 2008 and 2018 Agreements. If the parties agree that one or more of them should be considered or one party insists they should be considered, the parties are directed to advise the Court what if any additional discovery and or briefing they would require to bring this matter to a final close.

In view of the inexcusable failure to disclose the 2008 Agreement to Sports Tutor timely, the Court orders ProBatter to pay all reasonable legal fees and costs incurred by Sports Tutor in connection with damages discovery relating to the 2008 Agreement and the 2018 Agreement.

## Conclusion

For the foregoing reasons, Defendant's Motion to Exclude All Evidence and Argument Concerning Damages is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

/s/
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 29, 2019.