UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PROBATTER SPORTS, LLC** | : | |
| | : | |
| **Plaintiff,** | : | **No. 05-cv-1975** |
| | : | |
| **v.** | : | |
| | : | |
| **SPORTS TUTOR, INC.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**DAMAGES AWARD**

This is a patent infringement case.  In earlier decisions, the Court found that the patents-in-suit owned by Probatter Sports, LLC ("Probatter" or "patent holder" or "patentee") were valid and that Sports Tutor, Inc. ("Sports Tutor" or "infringer") infringed on those patents.  Part. Summ. J. Dec., Dkt. 439; Validity Dec., Dkt. 439; Infringement Dec., Dkt. 468.  The Court now determines what damages are adequate to compensate for the infringement pursuant to 35 U.S.C. § 284.   After careful review of the record, which spans over fourteen years, including evidence presented over seven days of trial, the Court makes the following factual findings and legal conclusions.

I.      BACKGROUND AND PROCEDURAL HISTORY

This is a long-running patent infringement case filed in December 2005. Compl., Dkt. 1.  The Court has delineated the facts and procedural history of this case in many prior decisions and assumes the parties' familiarity therewith.

After multiple stays for Patent and Trademark Office proceedings, the Court found the patents valid and conducted a trial and issued a written decision finding

1

and articulating its reasons for finding Defendant infringed Plaintiff's patent. Part. Summ. J. Dec., Dkt. 439; Validity Dec., Dkt. 439; Infringement Dec., Dkt. 468.  That decision was appealed and affirmed.  In this decision the Court resolves the sole remaining issue, damages, delineating only the facts and procedural history necessary to articulate the reasoning for its calculation and award of damages.

Probatter designs, manufactures, sells, installs and services a line of baseball pitching machines.  Probatter designed and manufactured a three-wheeled pitching machine, which contained patented features such as regenerative braking, a programmable controller, and horizontal and vertical linear actuators.  The two patents at issue are United States Patent Number 6,182,649 (the "'649 Patent") and United States Patent Number 6,546,924 (the "'924 Patent") (collectively hereinafter, the "Patents-in-Suit").  The patented feature at issue here is dynamic braking, a feature that causes the rapid deceleration of the wheels inside the ball throwing machine.  With rapid deceleration, the machine can rapidly eject a variety of unpredictable pitches, allowing the user to experience a real at-the-bat experience.  Probatter's more commercially successful patented invention is a video system which when integrated with dynamic breaking creates a life-like batting experience.

On July 15, 2015, the Court granted partial summary judgment in favor of Probatter against Sports Tutor.  The Court found Probatter established Sports Tutor infringed upon the Patents-in-Suit by incorporating dynamic braking in its ball-throwing machine without a license to do so beginning in March 2003.  Part. Summ. J. Dec. Dkt. 439. That same month, a five-day bench trial was held on issues

relating to the validity of the infringement claims, willfulness of the infringement, damages, and prejudgment interest.  Tr. 7/13/2015, Dkt. 455; Tr. 7/14/2015, Dkt. 456; Tr. 7/15/2015, Dkt. 452; Tr. 7/16/2015, Dkt. 453; Tr. 7/21/2015, Dkt. 454.  On March 23, 2016, the Court entered judgment in favor of Probatter on the issue of validity and enjoined Sports Tutor from making, using, offering for sale, or selling HomePlate machines (the "infringing machine").  Validity Dec. Dkt. 468.  Approximately thirteen years passed between when the infringement began and when Sports Tutor was enjoined.

The Court could not rule on the issue of damages when it rendered its decision on infringement because Probatter disclosed the method and measure of damages on the eve of trial.  Damages Disc. Dec., Dkt. 469.  Probatter initially disclosed that it would be seeking damages under the loss profits measure of damages.  *Id.* at 1.  However, after the close of discovery and shortly before trial, Probatter changed counsel and disclosed that it would be seeking damages under the reasonable royalty measure of damages, a method suggested in its earlier filings.  *Id.*  To fairly adjudicate damages on the merits, the Court reopened discovery on that issue alone, affording Sports Tutor two months to conduct discovery on Probatter's claim and affording Probatter one month to conduct rebuttal discovery on Sports Tutor's defenses.  *Id.* at 21.

During the interim, Sports Tutor appealed the Court's infringement and validity decisions, which the Federal Circuit affirmed.  Dkt. 471, 486.  Thereupon the Court resumed consideration of the issue of damages and conducted an evidentiary hearing over two days, beginning on October 31, 2019 and ending

3

November 1, 2019.  Dkt. 539; Tr. 10/31/2019, Dkt. 562; Tr. 11/1/19, Dkt. 563.  **Briefing ensued and the Court conducted a final teleconference on April 12, 2021, resolving the final issue precedent to ruling on the issue of damages.**

## II.    REASONABLE ROYALTY RATE

### A. <u>Legal Standard</u>

Section 284 of Title 35 of the United States Code specifies the measure of damages for patent infringement. "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  Section 284 "is unequivocal that the district court must award damages in an amount no less than a reasonable royalty." *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003).

Though a court "must award damages in an amount no less than a reasonable royalty"; *id.*; "[t]he burden of proving [the amount of] damages falls on the patentee." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  *See also Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990) (hereinafter *Lindemann*).  These concepts are at cross purposes when a patentee has not met its burden of proving damages but the record suggests that a reasonable royalty would be more than $0.

There is little guidance on what a district court should do when a patentee fails to present evidence of a single comparable royalty from which a reasonable

royalty can be discerned.  Further, before the enactment of § 284 the Supreme Court suggested that an award of damages required at least a minimal showing of damages.  *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641 (1915). In *Dowagiac*, the Court also discussed the importance of not over-compensating a patentee that presents minimal evidence.

A patentee is only entitled to the reasonable royalty for its patented feature; and is not entitled to damages for the entire product when the product contains other non-infringing features. *Id.* at 646–47.  The Court cited to the reasoning in *Tilghman v. Proctor*, 125 U.S. 136, 145 (1888) that

> [i]t is inconsistent with the ordinary principles of practice of courts of chancery, either, on the one hand, to permit the wrongdoer to profit by his own wrong, or, on the other hand, to make no allowance for the cost and expense of conducting his business or to undertake to punish him by obliging him to pay more than a fair compensation to the person wronged.

*Id.* at 647.  In applying these standards to the case before it, the Supreme Court held that "the evidence did not present sufficient data to justify an assessment of substantial damages" finding no evidence of an established royalty, the nature of the invention, the inventions utility and advantages, the extend of its use, or hurtful competition.  *Id.* at 648–50.  The Court reversed and remanded for further factual findings.  *Id.* at 651.

How a patentee proves a reasonable royalty rate logically would vary from case to case.  However, Federal Circuit case law has held unequivocally that a patentee is not required to set forth expert testimony in support of its claim of damages.  *See* 35 U.S.C. § 284 ("The court *may* receive expert testimony as an aid to determination of damages or what royalty would be reasonable under the

circumstances.") (emphasis added); *Dow Chem. Co.*, 341 F.3d at 1382 ("[S]ection 284 is clear that expert testimony is not necessary to the award of damages . . . .").

The trial court has broad discretion in deciding the reasonable royalty where the patentee introduced little or no credible evidence of a reasonable royalty. The Federal Circuit has declared that a district court's obligation to award some amount of damages "does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284." *Id.* at 1382 (citing *Lindemann*, 895 F.2d at 1406).

Nor is exactitude required. "[A] finding that a royalty estimate may suffer from factual flaws does not, by itself, support the legal conclusion that zero is a reasonable royalty." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). "[A] fact finder may award no damages only when the record supports a zero-royalty award." *Id.* "Determining a reasonable royalty does not require 'mathematical exactness,' but a 'reasonable approximation' under the circumstances of a given case." *See Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015).

There are several legal theories for establishing damages in a patent infringement case. Here, Probatter has elected to seek damages under the hypothetical negotiation theory of damages.

1. *Hypothetical Negotiation Theory of Damages*

"[T]he hypothetical negotiation or the "willing licensor-willing licensee" approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing to *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 116, 1120 (S.D.N.Y. 1970) (hereinafter "*Georgia-Pacific*")).  The hypothetical negotiation

> methodology encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.

*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337 (Fed. Cir. 2004).

> Like all methodologies based on a hypothetical, there will be an element of uncertainty; yet, a court is not at liberty, in conducting the methodology, to abandon entirely the statutory standard of damages "adequate to compensate" for the infringement. The royalty arrived at must be "reasonable" under all the circumstances; i.e., it must be at least a close approximation of what would be "adequate to compensate" for the "use made of the invention by the infringer."

*Id.*

In determining a reasonable royalty rate, courts are instructed to consider the *Georgia-Pacific* factors, which is a comprehensive, unprioritized, and often overlapping list of relevant factors for a reasonable royalty calculation. *ResQNet.com, Inv. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (discussing

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 116 (S.D.N.Y. 1970)).  The

*Georgia-Pacific* factors are:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
> 7. The duration of the patent and the term of the license.
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
> 9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
> 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
> 11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.
> 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
> 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.
> 14. The opinion testimony of qualified experts.
> 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented

**invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

*Georgia Pacific*, 318 F. Supp. at 1120.

The court's reasoning in *Lucent Technologies* illustrates the application of the *Georgia-Pacific* factors in a case with a fact pattern similar to the case before the Court.  580 F.3d 1301.  In *Lucent Technologies*, the Federal Circuit was asked to determine whether a jury award on damages was supported by substantial evidence. *Id.* at 1323–24.  There, the Federal Circuit concluded that the award was not. *Id.* at 1324.  In reaching this conclusion, the Federal Circuit first discussed the general rules in establishing a reasonable royalty for the purposes of calculating damages, highlighting particularly the burden on the patentee in proving damages. *Id.*  It explained that, even though determining a reasonable royalty rate under the hypothetical negotiation "involves an element of approximation and uncertainty" the evidence did not warrant the jury award. *Id.* at 1325.  One key issue was the comparability of licenses the patentee presented to evidence an established royalty.   The Federal Circuit found that "some of the license agreements [were] radically different from the hypothetical agreement" and "the other agreements, [the court was] simply unable to ascertain from the evidence presented the subject matter of the agreement." *Id.* at 1327–28.  The Federal Circuit also took issue with the jury award because of the "glaring imbalance between infringing and non-infringing features." *Id.* at 1333.  There, the court characterizes the infringed feature as a minor aspect of the much larger product. *Id.*  The Federal Circuit concluded that they were "left with the unmistakable conclusion that the jury's

damages award [was] not supported by substantial evidence, but [was] based mainly on speculation and guesswork." *Id.* at 1335. *Lucent Technologies* teaches that a damages award must be based on more than speculation and basing a damages award on a record that lacks sufficient evidence will not be upheld.

    2. *Book of Wisdom*

As explained above, the hypothetical negotiation theory of damages requires a degree of flexibility because courts can and sometimes must rely on facts that came into existence after the hypothetical negotiation. This concept has been referred to as the "book of wisdom." *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933). Some cases discussing the book of wisdom hold a reasonable royalty can be based on facts and circumstances that did not exist, but which could have been predicted at the time of the hypothetical negotiation while other cases say future facts and circumstances need not have been predictable. *Compare Unisplay, S.A. v. American Elec. Sign Co.,* 69 F.3d 512, 518 n.9 (Fed. Cir. 1995) ("The trial court properly instructed the jury to base its verdict on actual sales, not projected sales.") *with Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1385 (Fed. Cir. 2001) (expected sales figures in the infringer's business plan, which bears some relationship to actual sales, in existence around the time of the hypothetical negotiation was not speculative and "sales expectations at the time when infringement begins as a basis for a royalty, as opposed to an after-the-fact counting of actual sales," was proper, as the actual sales could not have been known at the time of the hypothetical negotiation).

The earliest discussion of reliance on post-hypothetical negotiation evidence in calculating damages was by Judge Cardozo in *Sinclair Refining Co.*, 289 U.S. 689.  In *Sinclair*, the Court held that "[t]he use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach."  *Id.* at 697.  The Court explained that post-infringement evidence may correct "uncertain prophecy."  *Id.* at 698.  In narrowing the use of this evidence, the Court also stated that "[t]o correct uncertain prophecy in such circumstances is not to charge the offender with elements of value nonexistent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning." *Id. Sinclair* contemplates consideration of elements of value neither known nor predicted by the parties to the hypothetical negotiation to compensate for the unauthorized use of a nascent patented invention.

In *Fromson* the Federal Circuit stated that:

> The methodology encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, *yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.*

853 F.2d at 1575 (emphasis added).  The "that could not have been known to or predicted" language was dicta as it was not supported by any citation nor did the facts in that case actually apply post-negotiation facts that the parties did not know or could not predict at the time of the negotiation.  Rather, the case was remanded for the purpose of allowing the district court to consider post-hypothetical

negotiation facts.  *Id.* at 1578.  In reaching this conclusion, the Federal Circuit cited to *Trans-World Mfg. Corp. v. Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984).     Before remanding, the court provided guidance to the district court, explaining that the book of wisdom is particularly suited to the determination of a reasonable royalty years after the infringement began when elements of value, present at the time of the hypothesized negotiation, are known, even if specific subsequent events could not have been predicted.

In *Trans-World*, the Federal Circuit held that the district court erred in excluding post-hypothetical negotiation information in its entirety.  *Id.* at 1568. However, the Federal Circuit also stated that "we express no opinion concerning the weight, if any, to be given such evidence or any conditions that might properly be imposed upon its admissions; we indicate only that we do not think the district court should have excluded it."  750 F.2d at 1568.  *Fromson* and *Trans-World* stand for the proposition that to fairly compensate a patentee for the value of its misappropriated invention, a court has discretion to rely on elements of the infringed inventions' value, present at the time of the hypothesized negotiation, even where subsequent events which affect their actual value were unknown and unforeseeable by the hypothetical negotiators; and the court has discretion to determine what if any weight to give such evidence.

Other Federal Circuit cases illustrate how post-hypothetical negotiation evidence is relevant.  For example, in *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983), decided after *Sinclair* and *TransWorld*, but before *Fromsom,* the Federal Circuit rejected an argument that the royalty award would

not have allowed the infringer to make a profit, explaining that "[t]he issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of profits actually realized, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations."  Also, in *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001), the Federal Circuit clarified that "the negotiation must be hypothesized as of the time infringement began." In applying this principal, the court affirmed a jury verdict based on projected future sales versus actual future sales where, at the time of the hypothetical negotiation, there was evidence, or elements of value, supporting the projected future sales.  *Id.* at 1385.   This case illustrates the point made by the *Fromsom* court that the then present elements of value not the subsequent realized value are used in applying the book of wisdom method.

Further, in 2009 the Federal Circuit cited to *Sinclair* in supporting its conclusion that post-hypothetical negotiation developments can be probative in determining a reasonable royalty rate in certain circumstances.   *Lucent Technologies,* 580 F.3d at 1333–34.  Though the court in *Lucent Technologies* cited to *Fromson*'s statement that the hypothetical negotiation analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators," the court in *Lucent Technologies* also stated that certain post-negotiation evidence "may provide information that the parties would frequently have estimated during the negotiation," suggesting future events must have been predictable as opposed to conceivable or imaginable. *Id.* at 1334.  Future events may shed light on the

existence and weight a hypothetical negotiator would have given to facts known at the time.

More recently, the Federal Circuit in *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) held that the district court erred in treating actual profits as a royalty cap, finding that "[t]hat treatment incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened."

The Court concludes that post-hypothetical negotiation facts and circumstances are only relevant when facts known at the time of the hypothetical negotiation were predictive of future facts and events which later materialized. Such predictive facts are ones which the hypothetical negotiators could have rationally projected based on then-known facts.  In other words, the book of wisdom does not authorize rank speculation; but authorizes instead consideration of facts the hypothetical negotiators could have known at the time of the hypothetical negotiation, as well as facts and events they could have reasonably inferred or extrapolated from the known facts.  Finally, future events may enlighten the court as to the facts known at the time of the hypothetical negotiation and the weight the negotiators may have given those facts.

B. <u>Analysis</u>

Prior to the July 2015 trial, Probatter submitted a trial memorandum asserting that a just and reasonable royalty rate in this case is 10% of the revenues generated by Sports Tutor for selling Sports Tutor's HomePlate machines ("the

infringing machines"). Dkt. 424. Following the 2019 trial on damages, Probatter's post-trial brief reduced its claim, asserting that the Court should conclude that the reasonable royalty rate ranges between $723,591 and $1,109,181 with a most likely outcome of the hypothetical negotiation being a royalty rate of 8% on infringing sales, for a total award of $887,345. Pl.'s Post-Trial Br. at 22, Dkt. 564. Sports Tutor argues that a reasonable royalty in this case is a lump sum payment of $50,000. Def.'s Post-Trial Br., Dkt. 565.

Probatter's request for damages based on the reasonable royalty rate theory requires consideration of the *Georgia-Pacific* factors. *See supra.* Probatter's post-trial brief addresses some but not all the *Georgia-Pacific* factors. Probatter claims that the Court is not required to consider all of the factors, citing to *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008), *mandate recalled and reissued on other grounds*, 557 F.3d 1377 (Fed. Cir. 2009)), *Minco v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1119–20 (Fed. Cir. 1996), and *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991)). Sports Tutor argues that the cases cited by Probatter do not stand for the proposition Probatter asserts and addresses all the factors in its briefing.

The cases cited by Probatter do not stand for the proposition that district courts are not required to consider all the *Georgia-Pacific* factors. First, Probatter cites to *Mars, Inc.* for its pronouncement that the Federal Circuit gives broad deference to conclusions reached by the fact finder. Pl.'s Post-Trial Br. at 20 (citing to *Mars, Inc.*, 527 F.3d at 1372). Deference to a fact finder's factual

conclusions is not leave for the fact finder to engage in less than a complete legal analysis. *Mars, Inc.* does not support Probatter's argument.

Second, Probatter cites to *Minco* and *SmithKline*, noting that in those cases the Federal Circuit did not engage in a factor-by-factor analysis of the evidence presented. Pl.'s Post-Trial Br. at 20–21. In *Minco*, the Federal Circuit merely summarized the key factual findings by the district court that were considered in determining a reasonable royalty, but the *Minco* court did not hold that a district court only needs to consider some of the *Georgia-Pacific* factors. 95 F.3d 1109. And in *SmithKline*, the Federal Circuit said that the district court did consider the *Georgia-Pacific* factors. 926 F.2d at 1168. Thus, *Minco* and *SmithKline* do not stand for the proposition that this Court is not required to consider all the *Georgia-Pacific* factors in determining damages.

With that said, the Court recognizes that not all the factors apply in every case and under the facts of this case, some of the factors overlap and would afford no weight in favor of either party. There are also instances in which there are no facts from which a factor could be analyzed, in which case the court could not apply it. In the interest of completeness and finality, the Court will consider each factor, but analyze only those which apply in determining the reasonable royalty for the use of the Patents-in-Suit by Sports Tutor, articulating whether and how they apply.

1. *"The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."*

The first *Georgia-Pacific* factor requires the Court to consider other royalties received by Probatter for the licensing of the Patents-in-Suit, which prove or tend to prove an established royalty. The Federal Circuit has explained that "using

sufficiently comparable licenses is a generally reliable method of estimating the value of a patent." *Apple Inc.*, 757 F.3d at 1325. "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *Id.* Even when a past license is not identical to what the outcome of the hypothetical negotiation was going to be, a court may still consider the past license but "must account for [evidence presented of] the differences in technologies and economic circumstances of the contracting parties." *Virnetx, Inv. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014).

The parties set forth several commercial agreements between Probatter and third parties for the purpose of proving an established royalty for the Patents-in-Suit. However, as detailed below, none of the agreements are principally a license agreement, nor is the economic substance of any of the underlying business transactions comparable to a license that would have resulted from the hypothetical negotiation.

a. Sports Attack Agreement

Sports Tutor asks the Court to consider a 2008 agreement between Probatter and Sports Attack, LLC ("Sports Attack") as a comparable license to the license that would have resulted from the hypothetical negotiation. Sports Attack and

Probatter entered into a written agreement (the "Sports Attack Agreement"), wherein the signatories characterize it as a "joint collaboration" agreement.  Def.'s Ex. DA.  Generally, under the Sports Attack Agreement, Probatter agreed to provide consulting services to Sports Attack in its continued development of a three-wheel pitching machine known as the E-Hack Attack machine.  *Id.*  In addition, Probatter granted Sports Attack a "royalty free license" to all of its patents for programmable pitching machines "subject to entering into an appropriate license agreement." *Id.* The parties never entered into a separate license agreement. In exchange for the consulting services and the royalty free license, Sports Attack agreed to sell E-Hack Attack machines to Probatter "at its lowest dealer or 'favored customer' price." *Id.*  In addition, Probatter would be the exclusive provider of video technology for the machine developed by their joint venture for at least two years, provided Probatter purchased 5 machines from Sports Attack within the twelve months after the product became available on the market.  *Id.*  Sports Attack's representative testified that Probatter's motivation in entering into the Sports Attack Agreement was "to reduce their cost and to provide a better system for their marking, they wanted to secure another pitching machine for the company who could affordably make them and was in the business."  Tr. 10/31/2019 at 152.

Relevant to the discussion of the Sports Attack Agreement is how the Sports Attack Agreement first came before the Court.  As stated above, the issue of damages in this case has spanned years.  Probatter presented its case-in-chief on the issue of damages in 2015.  However, Sports Tutor was not prepared to present its defense to Probatter's case because Probatter failed to give proper notice of its

method of calculating damages and the factual basis for its damages claim. Damages Disc. Dec.  After the 2015 trial, the Court decided an award of damages was warranted and the prejudice to Sports Tutor from Probatter's untimely disclosure would be cured by giving Sports Tutor additional time to conduct discovery on the issue of damages.  *Id.*  When Sports Tutor did, it uncovered the Sports Attack Agreement and filed a motion to exclude all evidence and argument concerning damages based on Probatter's failure to produce it.  Dkt. 511.  The Court issued a decision on Sports Tutor's motion finding that the parties to the Sports Attack Agreement intended to be bound by the Agreement, that the Sports Attack Agreement by its own terms, included a license, and ordered Probatter to pay all reasonable legal fees and costs incurred by Sports Tutor occasioned by its failure to disclose the Sports Attack Agreement.  Dkt. 535.

With that said, Probatter did not present evidence relating to the Sports Attack Agreement in its case-in-chief.  Rather, Sports Tutor presented the Sports Attack Agreement in its defense.  In its post-trial briefing, Probatter argues that the Sports Attack Agreement should not be considered by the Court in formulating the reasonable royalty rate because it is radically different from the hypothetical negotiation.  In attempting to prove a 'radical' difference, Probatter first states that the Sports Attack Agreement is a "joint collaboration agreement," unlike what the result of the hypothetical negotiation would have been, which is a legal right to sell what would otherwise be an infringing product.  Sports Tutor's expert argued that the Sports Attack Agreement is the most comparable license because it involved the Patents-in-Suit.  Further, Sports Tutor's expert opined that the Sports Attack

Agreement had a value of $7,139, which represented the sum total of the discount Probatter received from purchasing four E-Hack Attack machines from Sports Attack pursuant to the agreement.

The Court agrees with Probatter, the Sports Attack Agreement is not comparable. This is because the Sports Attack Agreement is not primarily a license for Sports Attack to sell machines with the patented features. It is primarily a research and development joint venture agreement. Its object is for the parties to develop a new ball throwing machine compatible with Probatter's video technology. In furtherance of that objective, the parties agree to share their respective technologies. The object of the agreement was not to license the Patents-in-Suit to Sports Attack for its own commercial exploitation. The licenses are integral to the research and development objective of the agreement.

Even if the Sports Attack agreement was principally a license, it would not be comparable because Probatter licensed *all* its pitching machine patents, not just the Patents-in-Suit and has introduced no evidence apportioning the value among the various unidentified patents licensed.

Even if the Court could find that the Sports Attack Agreement is at all comparable, the Court has been provided insufficient evidence to account for the differences between the Sports Attack Agreement and the hypothetical negotiation. Insufficient evidence was presented on the value of the licenses contemplated under the Sports Attack Agreement as opposed to the research and development collaboration and the exclusivity provision.

Sports Tutor's expert attributes a value of $7,139 to the joint collaboration agreement, but his reasoning is flawed for three reasons.  First, the value Sports Tutor's expert found was based solely on one part of the equation: the discounted price.  However, as detailed above, Probatter both gave and received additional consideration.  Second, Sports Tutor's expert's valuation provides a valuation of all the included patents, not just the Patents-in-Suit.  The Court could only impermissibly speculate the portion of the value attributable to the Patents-in-Suit. Third, Sports Tutor's expert's valuation is based on the actual outcome of the agreement and not what the parties to the agreement contemplated.  What the parties contemplated at the time they entered the agreement is a better representation of value for the sake of determining an established royalty than the actual result from a particular agreement.  This is even more apparent here, where it appears just based on the face of the agreement, that it did not materialize as intended.  The Sports Attack Agreement contemplated a discounted rate only if Probatter bought at least five E-Hack Attack machines in a 12-month period. However, Probatter never reached that threshold, having only bought 4 E-Hack Attack machines over the life of the agreement.

In addition, the Sports Attack Agreement contemplated the creation of "an appropriate license agreement," which never materialized.  In fact, Probatter did not even monitor Sprots Attack's use of the Patents-in-Suit.  When it tested the prototype developed under the agreement Probatter did not even attempt to determine whether it incorporated the Patents-in-Suit, undermining the argument Probatter assigned any value to them. Thus, the Court cannot find that the actual

value of the agreement is indicative of the intended value of a license to the Patents-in-Suit.

For the foregoing reasons, the Court finds the Sports Attack Agreement is not comparable to a license of the infringed patents derived from a hypothetical negotiation.  To the extent it may be comparable its value is not ascertainable from the record before the Court and arguably negligible.

### b. Battersby Security Agreement

The next agreement presented for consideration is a 2002 security agreement between Greg Battersby, a then-owner of Probatter, and Probatter (the "Battersby Security Agreement").  Def.'s Ex. DB.  Pursuant to that agreement, Battersby loaned $100,000 to Probatter and guaranteed an additional $200,000 of Probatter debt in return for a pledge of "all assets of [Probatter] now owned or [t]hereafter acquired" and "all proceeds of any of the foregoing after acquired property and accounts."  *Id.*  The Battersby Security Agreement was recorded with the Patent and Trademark Office ("PTO"), which shows that at the time of the agreement Probatter owned the '649 patent but not the '924 patent. *Id.,* McLean Report at 28.  Thus, the agreement could  only be instructive of the value of a license on one of the Patents-in-Suit, the '649 patent.

The Security Agreement is not a proxy for  determining a reasonable royalty because it was not comparable in purpose. The Battersby Security Agreement incorporates by reference a Guarantee and Indemnification Agreement, that separately states that "Probatter is unable to meet its obligation to refinance an existing loan in the amount of $100,000 from Cornerstone Bank . . . and has been

guaranteed by Battersby and Charles Grimes." *Id.*  Consequently, the purpose of the  Security Agreement was not to enable Battersby to exploit the Patents-in-Suit.

Probatter argues that the Court should conclude that the Battersby Security Agreement is not sufficiently comparable to a license agreement reached through a hypothetical negotiation and thus provides no basis to determine the reasonable royalty rate.  To support this conclusion, Probatter points out that the '924 patent was not accounted for in this agreement.   Probatter also argues that the Battersby Security Agreement was not an arms-length negotiation evidenced by Mr. Battersby's interest in Probatter.  Sports Tutor argues that the Battersby Security Agreement at least provides a ceiling of the value of the Patents-in-Suit.

The Security Agreement was not the product of two willing parties as contemplated by the hypothetical negotiation theory.  Mr. Battersby was an owner of Probatter. Tr. 11/1/19 at 24 (Pellegrino). Probatter was insolvent and unable to pay its debt guaranteed by Battersby.  Def.'s Ex. DB. He entered into the Security Agreement, not to acquire use of the Patents-in-Suit, but to salvage his investment in Probatter, stave-off a call on his guarantee and preserve the viability of Probatter in hopes of obtaining a return on his investment. Consequently, he was acting in his own financial interest irrespective of the value of the Patents-in-Suit.

The Security Agreement was issued to secure Probatter's debt.  A lender is concerned that the total package of security and guarantees equal or exceed their debt.  Thus, the value of the collateral pledged reflects the amount of debt Probatter owed, not the value of the Patents-in-Suit; and there is no evidence the debt Probatter owed bore any relationship to the value of the Patents-in-Suit.

The '924 Patent was not issued at the time the Security Agreement was negotiated and signed. While it is entirely possible Battersby and Probatter expected the Patent and Trademark Office ("PTO") to issue the '924 Patent and thus it is not unreasonable to infer the value of the collateral assumed the issuance of the patent, quite possibly with some discount attributable to the risk that a patent would not issue. This inference would however require the Court to speculate impermissibly as there is no evidence on the record to support this was a consideration. In fact, there is no evidence the value of the Patents-in-Suit bore any relationship to the amount of debt Probatter assumed and Battersby guaranteed.

On the contrary, the nature, substance and circumstances of the transaction does not suggest the amount of debt secured and money loaned was reflective of or based on the value of the Patents-in-Suit. ProBatter had other assets, including lucrative video patent and patent application, the '134 and '512 patents.  The video patents were Probatter's principle product and there is no evidence distinguishing the value of the video patents from the value of the Patents-in-Suit.

In sum, the Security Agreement did not have the same object as, was not valued like, and is thus not comparable to a license. Second, because Battersby was granted an interest in all Probatter's assets, its monetary value is overly inclusive and there are no facts on the record from which the Court could credibly attribute any particular portion of its value to the Patents-in-Suit.

The Court finds the Battersby Security Agreement does not prove or tend to prove a reasonable royalty for the Patents-in-Suit.

24

### c. Joyner Settlement Agreement

The next agreement before the Court is a settlement agreement between Joyner Technologies, Inc. ("Joyner") and Probatter, hereinafter referred to as the "Joyner Settlement Agreement."

Joyner was Probatter's competitor in the video market.  Tr. 10/31/2019 at 72. Joyner is owned and operated by James Joyner, the business is conducted out of Mr. Joyner's home in Georgia, and Mr. Joyner does not have any employees.  Tr. 10/31/2019 at 71, 141–42.

In May 2005, Probatter filed suit against Joyner in the District of Iowa alleging patent infringement on its '134 patent and '512 patent.  Def's Ex. BW.  These are patents for video display features, not the dynamic braking features at issue here. Tr. 10/31/2019 at 48–49 (Battersby).  In December 2005, Probatter filed a second suit against Joyner, this time in the District of Connecticut, alleging patent infringement on the Patents-in-Suit.  Def.'s Ex. BW.  Probatter also filed lawsuits against Joyner's customers in several jurisdictions throughout the country claiming infringement of its patents. Tr. 10/31/2019 at 71; Def.'s Ex. BV.  In the action relating to the Patents-in-Suit, Joyner filed a counterclaim seeking declaratory judgment of non-infringement, invalidity, and/or unenforceability.  *Id.*  Probatter filed a motion to dismiss the counterclaim for lack of jurisdiction.  *Id.*

In June 2006, Joyner and Probatter executed a mutual "Covenant Not to Sue" in the action relating to the Patents-in-Suit.  Def.'s Ex. BW.  In the covenant, Probatter agreed not to prosecute the action against Joyner for infringement of the Patents-in-Suit in exchange for Joyner withdrawing its counterclaim.  *Id.*  The

covenant applies only to the use, purchase and sale of the Patents-in-Suit. *Id.* It also called for withdrawal of all lawsuits against Joyner's customers. *Id.* There was no monetary or other quantifiable consideration for the mutual covenants, and they did not resolve or have any relationship to a later settlement of Probatter's separate claim that Joyner was infringing its '134 and '512 patents. *Id.*

Over a year later in October 2007, Joyner and Probatter executed a "Settlement Agreement," resolving a separate case in which Probatter claimed Joyner infringed upon Probatter's video display patents.   Def.'s Ex. BV; Tr. 10/31/2019 at 75, 78. The Joyner Settlement Agreement resolved the patent infringement case involving the '134 and '512 patents, not the Patents-in-Suit.  The Joyner Settlement Agreement clearly does not affect the Patents-in-Suit, in that it expressly states that it does not supersede the 2006 covenant.   Def.'s Ex. BV. Under this settlement agreement Joyner agreed to, *inter alia*, (1) not sell its video machine design in connection with any machine other than the infringing machine for 18 months,  (2) pay $60,000 for "all past claims," and (3) pay 7.5% of its gross revenues from the sale or lease of its video machines and pitching machines with its video machine until May 2012 or up to $425,000, whichever comes sooner. *Id.* In exchange, Probatter agreed to dismiss its '134 and '512 patent action against Joyner as well as the lawsuits against Joyner's customers, and Probatter agreed to release Joyner and related parties from any and all claims. *Id.*

Probatter argues that the Court should conclude that the Joyner Settlement Agreement is sufficiently comparable to allow the Court to determine a royalty for the Patents-in-Suit.  Probatter points to its expert's testimony that the Joyner

Settlement Agreement is the one license that is more comparable than the others because Joyner agreed to pay 7.5% royalty of the infringing machines at issue in this case.  This argument ignores the fact that settlement resolved the litigation over, and licensed the use of, the video patents not the Patents-in-Suit.  In addition, the video patent litigation settlement was reached over a year after the dynamic breaking litigation settlement over the Patents-in-Suit and there is nothing in the record to suggest a nexus between the settlements.

The Court cannot equate these sets of patents, and neither could the parties to the Joyner Settlement Agreement based on the fact that there were two lawsuits addressing these sets of patents separately, there were two agreements addressing these sets of patents separately, and the two sets of patents reflect entirely different features.  The video patents and the Patents-in-Suit are not the same.  It is also clear that the dynamic braking of the Patents-in-Suit and the video display had different pricing structures.  The pricing structure of Joyner's video pitching machines is more than $40,000, where the pricing structure for Sports Tutor's non-video pitching machines is less than $7,000.  Pellegrino Report at 24–25.  The Court finds Probatter has failed to establish the video patents and the pitching machine patents are comparable.

Further, the Joyner Settlement Agreement is not a proxy for an arms-length negotiation of a royalty for the Patents-in-Suit. The very nature of a settlement agreement is distinct from an arms-length negotiation on which the hypothetical negotiation is based.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. Supp. 2d 147, 159 (D.R.I. 2009) ("settlements offered, negotiated or made under threat of litigation

are generally not considered probative of a reasonable royalty because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction.") (citing to *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed. Cir. 1983)). Both parties to the Joyner Settlement Agreement had incentives to pay more or accept less than what the reasonable royalty was at the time. For example, Mr. Joyner was facing the reality of litigation far from his home-office in Georgia and likely did not have the means to fund a protracted litigation even if he would have been successful in his counterclaims and defenses. He also had an interest in preserving his business reputation and client base by having the suits against his customers withdrawn. Probatter also had an interest in ensuring the court did not rule against them on the validity of the Patents-in-Suit in advance of this case against Sports Tutor. The experts did not quantify the impact of these external considerations on the amount of the settlement.

In summary, even if the patents affected by the Joyner Settlement Agreement were limited or similar to the Patents-in-Suit, the circumstances surrounding the formation of the agreement create too many unknown variables for the Court to properly rely on it as evidence of an established royalty. The Court finds that the Joyner Settlement Agreement does not prove or tend to prove an established royalty for the Patents-in-Suit.

The Joyner Settlement Agreement does tend to support the Probatter would have been willing to enter into a royalty based on a percentage of total revenue, which was one of the aspects of the Joyner Settlement Agreement. As detailed

above the video patents were much more valuable than the Patents-in-Suit, which is evidenced by the very different pricing structures and by the fact that Probatter only entered into a monetary settlement for the video patents and not the Patents-in-Suit.  Thus, the Joyner Settlement Agreement in principle, which included *inter alia* a capped 7.5% royalty on total revenues, is the ceiling of what the hypothetical negotiation would have yielded.

### 2.   *"The rates paid by the licensee for the use of other patents comparable to the patent in suit."*

The second *Georgia-Pacific* factor requires the Court to consider rates Sports Tutor paid for the use of other patents comparable to the Patents-in-Suit.

The only somewhat relevant transaction would be the 2002 Scott Patent Purchase.  The Court addressed the incomparability of this machine to ones incorporating the Patents-in-Suit in its infringement decision ad recites only those facts essential to the issue of damages.  In 2002, approximately one year before infringement began, Sports Tutor purchased a patent from Jack Scott (the "Scott Patent") for $10,000.  Pl.'s Ex. 77I; Def.'s Ex Z; Pellegrino Report at 29; Tr. 7/14/15 at 39.  The Scott Patent was granted on July 22, 1997 and was for a three-wheeled pitching machine.  Def.'s Ex. Z.  However, the Scott Patent makes no mention of regenerative braking or the benefits of rapidly decelerating wheel speeds.  Tr. 7/14/2015 at 39–40.

In addition to the Scott Patent, Sports Tutor purchased a pending patent application ("Scott Application") for a baseball pitching system from Scott for $40,000.  Pellegrino Report at 29; Pl.'s Ex. 77M.  The Scott Application was

ultimately abandoned.  Pl.'s Ex. 77M.  The sum total paid for the Scott Patent and the Scott Application (collectively "Scott Patent Purchase") was $50,000.

Probatter argues that the Court should not consider the Scott Patent Purchase as a comparable for two reasons.  First, Probatter argues the Scott Patent Purchase was not given any economic value by Sports Tutor's expert.  More specifically, Probatter's expert stated in his report and during his testimony that Sports Tutor's expert did not consider circumstances other than the price paid in determining the value of the Scott Patents.  McLean Report at 29; Tr. 11/1/19 at 144.  The Court does not find that this justifies not considering the Scott Patent Purchase in its entirety.  Probatter's argument about Sports Tutor's expert's valuation generally tries to point to what is missing but does nothing to fill the gaps.  Sports Tutor's expert did not discuss how the Scott Patent Purchases were made in the absence of extraordinary circumstances that would affect the value of the agreement.  But there is no reason in the record to think such circumstances existed.  Probatter has the burden of proof and has not proven an extraordinary circumstance affecting the face value of the Scott Patent Purchases.  Therefore, the Court finds that the value given to the Scott Patent Purchases is $50,000.

Second, Probatter generally argues that the Scott Patent is not comparable to the Patents-in-Suit because unlike the Patents-in-Suit: (i) they did not receive industry praise, (ii) they had not been copied by third parties, (iii) they had never been practiced, and (iv) they never enjoyed commercial success.  Consequently, the Scott Patent features were not as valuable as the Patents-in-Suit.  The Court agrees that the patented features in the Patents-in-Suit are more valuable than the

patented features in the Scott Patent.  The Court has already found that the Patents-in-Suit satisfied a long felt need for a ball-throwing machine that could generate any pitch, at any speed, at any location within a very short time frame.  Validity Dec. Sports Tutor did not provide any evidence that would allow the Court to compare the patented features in the Scott Patent Purchase and the features to the Patents-in-Suit.  Without such evidence, the Court cannot discern how the value of the Scott Patent Purchase compares to the value of the hypothetical negotiation.

There is another key distinction between the license that would have resulted from the hypothetical negotiation and the Scott Patent, which is that through the Scott Patent purchase Sports Tutor became the owner of the Scott Patent and the Scott Application.  The hypothetical negotiation would have resulted in a simple license.  Actual ownership of the patent would be more valuable because the purchaser has rights over the patent that a licensor does not.  A license can also be of limited duration and it need not be exclusive while the owner of a patent has exclusive ownership for the life of the patent unless it chooses to monetize the patent by issuing a license.  Neither party presented evidence explaining the difference in value between a purchase and a license other than to simply point out that they are different.

Without evidence on how the patented features at issue compare to the Scott Patent Purchase or evidence on the difference in value of a patent purchase versus a patent license, the Court does not have sufficient evidence to determine if the Scott Patent Purchase is comparable or how to account for differences.  No other potential transaction related to this factor has been presented to the Court.

The Court also questions the comparability of the Scott assets to the Patents-in-Suit.  Had they been comparable it is irrational for Sports Tutor to have infringed and persisted in infringing on the Patents-in-Suit, pursued the matter before the PTO, and litigated this case for so many years if it had a viable alternative. The Court is dubious the parties would have incurred the cost of litigating and administratively disputing validity and infringement of the Patents-in-Suit for more than a decade if Sports Tutor believed they were comparable and a license was only worth $50,000.

Finally, the testimony and evidence introduced at trial and the physical characteristics of the Scott machine cast critical doubt on the proposition that the Scott patents had any value.  This conclusion is further supported by the fact that the Scott machine sat outside under a tarp for several years.  That is not the way an object of value would be stored.

Therefore, because there are no other comparable patents to determine rates paid by Sports Tutor, the Court finds that the second *Georgia Pacific* factor does not support either parties proposed reasonable royalty calculations.

3. *"The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold."*

The third *Georgia-Pacific* factor requires the Court to consider the nature and scope of the license.  "Non-exclusive licenses generally command lower royalties." *Lucent Techs., Inc.*, 580 F.3d at 1335.  Here, as detailed above, none of the proffered agreements are a comparable license to what the hypothetical negotiation would have yielded.  However, the most arguably analogous agreements would be the

32

Sports Attack Agreement and the Joyner Settlement Agreement. Neither agreement contemplated creating an exclusive license. To the contrary, Probatter was free to license the Patents-in-Suit following both agreements. Therefore, the third *Georgia-Pacific* factor suggests that the hypothetical negotiation would have yielded a non-exclusive license, supporting a lower royalty.

> 4. *"The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly."*

The fourth *Georgia-Pacific* factor requires the Court to consider Probatter's established policy and marketing to maintain the Patents-in-Suit. "In terms of hypothetical negotiation, if the patent owner had a policy of not licensing the patent-in-suit, the patent owner would not have been a "willing licensor" at the time of the negotiation. This would mean that the infringer would have had to pay a higher royalty rate to induce the patent owner to ignore the policy and license the patent." Patent Damages Law and Practice § 3:24.

Three pieces of evidence tend to suggest that Probatter did not maintain a policy of protecting its monopoly over the Patents-in-Suit: (1) the Joyner Covenant Not to Sue, (2) the Sports Attack Agreement, and (3) Probatter's accessory infringement of its own patents.

### a.  Joyner Covenant Not to Sue

As explained in greater detail above, Probatter brought two suits against Joyner; one for infringement of the Patents-in-Suit and one for infringement of the video patents. The suit involving the Patents-in-Suit settled through a covenant not to sue, where Probatter agreed to not sue Joyner for the use of the Patents-in-

Suit in exchange for Joyner withdrawing its counterclaims against Probatter.  The suit involving the video patents settled, where Probatter would receive a large monetary sum from Joyner for the use of the video patents.  The two outcomes of the two suits when juxtaposed shows that the Patents-in-Suit have a negligible value when compared to the video patents and Probatter was more inclined to exact monetary value for the use of the video patents and not the Patents-in-Suit.  This shows that Probatter was less inclined to protect its property interest in the Patents-in-Suit.

      b.  **Sports Attack Agreement**

In addition, Probatter's conduct during the joint collaboration agreement with Sports Attack further shows that Probatter was not inclined to protect its rights in the Patents-in-Suit.  The Sports Attack Agreement expressly contemplated the creation of "an appropriate license."  Def.'s Ex. DA.  When the E-Hack Attack machine was created and given to Probatter to test, neither the President of Probatter nor Probatter's engineer bothered to determine if the machine used the Patents-in-Suit.  Tr. 10/31/2019 at 100–02, 113.  Rather, Probatter only tested if the E-Hack Attack machine properly synchronized with the video technology.  *Id.* at 114–15.  This suggests Probatter was not interested in exercising property interest over the use of the Patents-in-Suit.

Probatter never entered into the "appropriate license" contemplated by the Sports Attack Agreement even though Sports Attack was marginally successful in selling the machine to parties other than Probatter.  The evidence shows that Sports Attack generated $1.4 million in sales on the E-Hack Attack machine and

Probatter did not seek to receive a royalty from Sports Attack for the use of the Patents-in-Suit on those sales.  This tends to suggest either Probatter lacked diligence in protecting its patent rights or Probatter did not believe it could exact a royalty from Sports Attack for the use of the patents.  Either way, this evidence shows that Probatter did not exercise patent protection.

### c.  Accessory Infringement

Lastly, Probatter's conduct in selling the infringing machine shows that Probatter was not protecting its rights in the Patents-in-Suit.  Probatter purchased the infringing machines from Sports Tutor while the litigation was ongoing.  Def.'s Ex. Dr.  In addition, while believing Sports Tutor was infringing on the Patents-in-Suit, Probatter created a conversion kit that would allow owners of the infringing machine to add Probatter's video technology.  In essence, Probatter was an accessory in the infringement of its own patent.  This is further evidence that Probatter was not inclined to protect its patent rights.

In summary, the third *Georgia-Pacific* factor weighs in favor of a lower royalty because of Probatter's policy, as exhibited by its conduct, in not protecting its monopoly and rights over the Patents-in-Suit.

5. *"The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."*

The fifth *Georgia-Pacific* factor requires the Court to consider the commercial relationship between the parties.  When the parties are direct competitors, such factor weighs in favor of a higher royalty because the patent

holder would be less willing to enter into a license agreement that would take away from its own profits.  *See Georgia-Pacific*, 318 F. Supp. at 1123–24.

The parties are not direct competitors. At trial, Michael Suba, engineer for Probatter, testified that Sports Tutor was a direct competitor to Probatter in the multi-pitch programmable pitching machine market.  Tr. 7/13/2015 at 118.  However, Probatter's core competency is video systems.  Tr. 10/31/2019 at 91.  Probatter sells pitching machines with video simulators attached.  *Id.* at 142.  Principally, Probatter does not sell its own ball-throwing machine; it sells its video system attached to ball-throwing machines made by other companies, including Sports Tutor.  *Id.* at 34; Tr. 10/31/2019 at 84 (Battersby). Since Probatter did not sell ball throwing machines incorporating the Patents-in-Suit principally, it was not a direct competitor of Sports Tutor for purposes of this factor.

The parties do not contend that they are competitors. Each party's expert opined that the relationship between Probatter and Sports Tutor is not one of direct competition.  Pellegrino Report at 34; McLean Report at 38.  Sports Tutor's expert opined that the relationship is more of inventor and promoter.  Pellegrino Report at 34.

The Court finds that Probatter and Sports Tutor's commercial relationship is not of direct competitors. This tends to support a lower royalty rate because the license of the Patents-in-Suit would not have limited Probatter's core business.

6. *"The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."*

36

The sixth *Georgia-Pacific* factor requires the Court to consider the effect of selling the infringing machines had on Sports Tutors' convoyed sales.

Sports Tutor sold accessories for the infringing machine.  Ex. 56 at 52. Based on its September 2006 price list, it sold the following add-ons at retail price: (1) control center for $1,995, (2) wired remote for $200, (3) protective cover for $95, (4) extended warranties non-commercial for $300, and (5) extended warranties commercial for $800.  *Id.* at 39.  Sports Tutor's expert opined that these revenue streams cumulatively represent about 5% of Sports Tutor's total revenue. Pellegrino Report at 37.  Sports Tutor's expert found that this factor did not weigh in favor of either party in the hypothetical negotiation, to which Probatter's expert agreed.  Pellegrino Report at 38; McLean Report at 39.  The Court finds this factor is neutral.

### 7.  "The duration of the patent and the term of the license."

The seventh *Georgia-Pacific* factor requires the Court to consider the duration of the patents in suit and the term of an associated license.

Probatter's briefing does not address this factor.  Both experts agree that at the time of the hypothetical negotiation, the remaining exclusivity period was 16 years.  Pellegrino Report at 39, McLean Report at 40.  This is a considerable amount of time, which indicates that Sports Tutor would have been willing to pay a higher royalty than wait for the patent term to expire.

With respect to the term of an associate license, Sports Tutor's expert discussed the Joyner Settlement Agreement, which has a term of 5 years. Pellegrino Report at 40.  Sports Tutor's expert opined that Probatter's bargaining

position as it relates to duration would have been less compared to that in Joyner because Joyner was a direct competitor, unlike Sports Tutor. *Id*.  Sports Tutor's expert concluded that this factor weighs in favor of Sports Tutor. Probatter's expert disagrees, finding no reason why a five-year cap would apply to this negotiation, particularly based on the amount of time remaining on the patent term.  McLean Report at 40.

As discussed in greater detail above, the Court did not find a comparable license.   However, as mentioned above, the Joyner Settlement Agreement involving the video patents did have a value/time cap.  The Court is not convinced that simply because the Joyner had a value/time cap, the hypothetical negotiation would have yielded a value/time cap.  There is nothing in the record showing why such cap was instituted in the agreement with Joyner.  It is not apparent why a cap would have been in place in the hypothetical negotiation especially because Probatter was not selling its own pitching machine by itself and would rely on distributors like Sports Tutor in order to receive a regular profit from the Patents-in-Suit.

Accordingly, the Court finds that the hypothetical negotiation would have yielded a higher royalty based on the amount of time Probatter had on the patents and that the license term would not have been limited by a value or time cap.

8. *"The established profitability of the product made under the patent; its commercial success; and its current popularity."*

The eighth *Georgia-Pacific* factor requires the Court to consider the established profitability of products made with the Patents-in-Suit incorporated, their commercial success, and its current popularity.

As the Court previously found:

> Probatter Simulator has been a commercial success, and its success is in some way due to the nature of the claimed invention. Probatter has sold approximately 500 machines in 48 states and 12 countries, and the buyers have included Major League Baseball teams, professional baseball players, and college programs. ECF No. 455 at 88:13–90:18 (Suba Testimony); Pl. Ex. 64 (Video). Probatter Simulator has generated approximately 20 million dollars in gross revenue, and Probatter earns approximately 35–70% in gross profit margins from selling its machine. ECF No. 455 at 108:6–11 (Suba Testimony). Probatter Simulator costs significantly more than other pitching machines, and this premium is justified by its patented features. *Id.* at 106:7–14.

Invalidity Dec. at 19. The Court also previously found that:

> HomePlate Machines have also been a commercial success, and their success is due to the use of Probatter's patented technology. Sports Tutor has sold over 2,000 machines, and the buyers have included Major League Baseball teams, professional baseball players, and college programs. ECF No. 455 at 224:3–21; Pl. Exs. 56 (Financials), 92 (Stipulation of Sales). HomePlate Machines generated approximately $10 million in gross revenue, and Probatter earns at least 20–30% in gross profit margins from selling its machine. ECF Nos. 455 at 224:16–21 (Greene Testimony); 456 at 70:9–71:7 (Green Testimony). HomePlate Machines cost significantly more than other Sports Tutor machines, and "one of the reasons" justifying the significantly higher price is the use of features patented by Probatter. ECF No. 456 at 68:21–69:12 (Greene Testimony). Probatter Simulator sells for approximately $40,000; HomePlate Machines sold "for right around that $5,000 price—psychological price point." ECF No. 455 at 106:7–13 (Suba Testimony); ECF No. 69:13–22 (Greene Testimony).

*Id.* at 19–20.

These findings still rein true and lean in favor of a higher royalty because the products made with the Patents-in-Suit features incorporated were profitable to Probatter and enjoyed commercial success.  However, the extent of this profitability to Probatter was never established.  At trial, neither party introduced evidence of the sale price of a Probatter ball-throwing machine incorporating the

Patents-in-Suit.  Nor was there evidence of whether Probatter sold machines incorporating the Patents-in-Suit without video.  As stated above, Probatter's primary book of business was selling video display for another company's ball throwing machine.  Meaning, there is no evidence to establish how much of Probatter's profits are attributable to the video display and how much is attributable to the machine with dynamic breaking.  In other words, Probatter's profits from the Patents-in-Suit are not established, leaving only Sports Tutor's profits for consideration.

Probatter's proposed findings of fact and conclusions of law are replete with calculations based on Sport's Tutor's profits from infringement, but it does not show that Probatter's profits suffered because of the infringement. Such evidence could be critical to calculating a reasonable royalty, the measure of damages Probatter has elected rather than lost profits. Sports Tutor's profits alone are not instructive.

Probatter introduced insufficient evidence establishing the profit Sports Tutor made from selling infringing machines.  Probatter cites to over 100 pages of accounting data without any analysis and asks the Court to find that it represents a 34% profit margin.  The Court is unpersuaded that this unexplained conclusion is correct.

Probatter's citation to Sports Tutor's CEO's testimony also does not establish the profit margin.  This is because the cited testimony relates to the profit margin goals for dealers, not Sports Tutor.  Tr. 7/14/2015 at 70–71.

Sports Tutor's expert testified that Sports Tutor made a profit of approximately 10% of the sales price of each infringing machine. Tr. 11/1/2019 at 11. Because the Court does not have clear evidence to the contrary, the Court finds that Sports Tutor enjoyed a 10% profit on the infringing machine.

Sports Tutor's expert opined that a 10% royalty would cause Sports Tutor to disgorge their entire profit. *Id.* Damages for the entirety of the profit of an infringing machine is permitted under the "entire market value rule" when certain narrow circumstances are met. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66–67 (Fed. Cir. 2012).

> Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit." . . .

> The entire market value rule is a narrow exception to this general rule. If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product

*Id.* The entire market value rule does not apply in this case because the infringing feature is dynamic braking not the entire ball-throwing machine.

In addition, to the extent the measure of damages is a reasonable royalty based on a hypothetical negotiation, it is axiomatic that no negotiator would agree to a license fee equal to the entire profit derived from the license.

Therefore, this factor weighs in favor of a royalty of less than 10% because, even though products with the patented features incorporated enjoyed success,

those features were not the sole driving feature attributable to the demand for the product or profits from its sale.

9. *"The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results."*

The ninth *Georgia-Pacific* factor requires consideration of the utility and advantages of the patent technology over old modes or devices.  Here, the Court has previously found in the decision on invalidity, that "Probatter Simulator has been a commercial success, and its success is in some way due to the nature of the claimed invention."  Invalidity Dec. at 19.  Further, the Court found that "HomePlate Machines have also been a commercial success, and their success is due to the use of Probatter's patented technology."  *Id.*  The Court found that "[t]here was a long-felt need for designing a ball-throwing machine that could generate any pitch, at any speed, at any location within a very short period of time." *Id.* at 20.  Evidence was presented that the ability to throw any pitch at any speed at any location within seven to ten seconds is beneficial.  Michael Suba, engineer for Probatter, credibly testified that:

> The main thing that everybody's impressed with is that the machine can throw any type of pitch that an actual pitcher can throw at any speed. It can throw to any location that the batter wants it to, and it can do that one after another every seven to ten seconds. You can continue to do it all day long.

Tr. 7/13/2015 at 81.

These conclusions were reached for the purpose of finding validity and infringement, not to quantify damages. As noted earlier, Probatter's core competency was its video technology and Probatter sold that technology attached

to the ball-throwing machines of other manufacturers. The Court finds the Patents-in-Suit were not wholly responsible for Probatter's marketing success.

Probatter offered no evidence of the contribution the Patents-in-Suit contributed to the marketing success of its ball-throwing machines. While Probatter did present a list of industry praise it received for its pitching machines that contained the patented features, the praise reported does not attribute the success to the patented features.  For example, Fox Sports Network reported:

> [I]t's already a hit in the major leagues, the Yankees, the Red Sox, the Mets, Indians, and the White Sox are all stepping up to the plate and signing the hottest free agent in the game – the ProBatter pitching simulator, the PX2. The unique pitching machine that has incorporated technology and video to nearly duplicate the experience facing a real life pitcher."

Pl. Ex. 64. This praise focuses on the technology, equating the dynamic-breaking and video technologies.

The Patents-in-Suit undoubtedly distinguish Probatter's ball-throwing machine from its competitors'. Former third baseman for the Kansas City Royals, Kevin Seitzer, proclaimed: "It's an incredible piece of equipment . . . it will throw 40 to 100 miles an hour and it will throw any pitch that you can possibly ask for. I mean it is absolutely amazing . . . it's exactly like you're facing the guy out on the mound." Pl. Ex. 69.  This testimonial does not quantify the value of the patented features as compared to the other features of the machine, but it indicates the Patens-in-Suit have substantial value, even in the absence of its other features, in particular its video display.

Cutting at Probatter's claim of utility is the fact that Probatter sold its video display with machines that did not have dynamic braking.  Approximately half of

43

the machines sold by Probatter did not have dynamic braking.  Tr. 11/1/19 at 15–16.  This shows that while dynamic braking may have been an improvement, it was not the kind of improvement that eliminated the market for old modes.

Based on the testimonial, the infringement and other evidence in the record, the Court finds that the Patents-in-Suit were a material contribution to the marketing success but not the entire basis of success.

10. *"The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."*

The Court has discussed these features in its analysis of the eighth and ninth factors.

11. *"The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."*

The eleventh *Georgia-Pacific* factor requires the Court to consider the extent to which the infringer made use of the invention and any evidence probative to the value of that use.  Probatter argues that Sports Tutors profits establish the Patents-in-Suit were valuable.  Sports Tutor's expert provided in his report information about Sports Tutor's post-infringement sale of like-machines that did not infringe on the patents-in-suit.

a. **Sports Tutor's Profits**

Probatter argues that the Court should conclude that infringing the Patents-in-Suit proved very valuable to Sports Tutor because it allowed it to increase its overall net operating income by $226,831 to $356,015, per year comparing the years 2011 (during infringement period) and 2017 (two years after infringement period).  Pl.'s Proposed Findings of Fact at 23.  Comparing these years is misleading.  2011

took place eight years after infringement began, where 2017 was only two years after the infringement ended.

Though Sports Tutor was able to release a non-infringing ball throwing machine quickly after being enjoined, its not reasonable to believe that the new machine's marketing success would be comparable to the success of a machine that had been on the market for six years longer.  In addition, no evidence was presented as to the market for ball throwing machines during those time periods that could address how market variability impacted sales.  Thus, the Court is unpersuaded that a comparison of 2011 and 2017 sales establishes value credible evidence.

### b.  Design Around

Sports Tutor's expert explained that after the court order enjoining Sports Tutor from selling the infringing machine, Sports Tutor redesigned their machine and began selling those machines on the market.  He argues that this is evidence that patented features at issue here are not so valuable because Sports Tutor was able to remove them and still sell machines at a comparable rate.

As explained more fully above, the book of wisdom does not require a court to consider post-hypothetical negotiation evidence the parties could not have reasonably known at the time of the hypothetical negotiation. The hypothetical negotiation would have taken place in March 2003, which was more than thirteen years before the introduction of the non-infringing product.  There is no evidence showing that either party knew about this design-around option at the time of the hypothetical negotiation or that they could have known about it, especially without

access to the Patents-in-Suit and the intervening technological advances.   A significant amount of time passed between the hypothetical negotiation and the design-around during which Sports Tutor had the benefit of learning about the technology behind the Patents-in-Suit and other technological advances.  It is not reasonable to believe the parties could have predicted this design-around option.  Further, if this design-around option was available to Sports Tutor, it defies logic that it would have infringed and litigated this matter for so many years.

 Therefore, the Court finds that the evidence relating to the design-around does little to detract from the value of the patented features.

12. *"The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."*

The twelfth *Georgia-Pacific* factor requires the Court to consider custom within the relevant industry and comparable licenses or sales.  Probatter did not present evidence on this factor.  Probatter's rebuttal expert found that "this factor provides no additional guidance here."  McLean Report at 55.  Sports Tutor's expert reported not finding any comparable license agreements.  Pellegrino Report at 62.  The Court finds this factor does not tend to establish what the hypothetical negotiation would have yielded.

13. *"The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."*

The thirteenth *Georgia-Pacific* factor focuses on the portion of realizable profit credited to the Patents-in-Suit.  "The patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the

patentee's damages between the patented feature and the unpatented features.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 1265 (2019).  Here, under the facts of this case, this type of evidence was not presented.  Factors 8 and 11 sufficiently address the considerations relevant for factor 13.

14. *"The opinion testimony of qualified experts."*

The fourteenth *Georgia-Pacific* factor focuses on opinions of qualified experts.  Here, Defendant offered expert testimony on damages alone and Plaintiff offered expert testimony challenging Defendant's expert's opinions. The parties offered no credible evidence of what the parties would have considered in a hypothetical negotiation. The proffered evidence relevant to this factor is not credible for the reasons stated above.

15. *"The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."*

The fifteenth and final *Georgia-Pacific* factor requires the Court to consider what a licensor and a licensee would have agreed to in a hypothetical negotiation to license the Patents-in-Suit.  Sports Tutor's expert focuses some of his analysis of this factor on the bargaining positions of the parties at the time of the hypothetical negotiation.  The Federal Circuit has explained that "emphasis on an individual inventor's lack of money and manufacturing capacity can tend to

47

distinguish the respect due the patent rights of impecunious individual inventors from that due the patent rights of well-funded, well-lawyered, large manufacturing corporations." *Fromson*, 853 F.2d at 1575.  The Court does not find the bargaining position of the parties at the time of the hypothetical negotiation favors Sports Tutor.

The Court finds that the bargaining position, while not determinative, favors a higher royalty.  There is no evidence Sports Tutor knew Probatter's financial condition. The evidence suggests it would not have known because Probatter was a private closely held company whose financial position was unlikely to be in the public domain or the subject of public interest.  Moreover, Sports Tutor offered no evidence of its knowledge of Probatter's financial position at the time of the hypothetical negotiation.

In addition, Probatter was unlikely to license the Patents-in-Suit at a depressed price to secure funding to remain in business because Mr. Battersby was its financial deep-pocket.  On the contrary, because Probatter had a financial backer and was insolvent it is more likely Mr. Battersby would have influenced Probatter to exact as high a royalty as it could negotiate.  In addition, the industry acceptance of the Patents-in-suit would have made a licensee desirous of obtaining a license.  For these reasons, this factor favors a higher royalty.

Aside from the relative bargaining strength, the relative bargaining position of the parties would depend on reasons some of which are not addressed by Sports Tutor's expert report.  Those reasons include the uniqueness of the technology embodied in the Patents-in-Suit, the demand for the product, the ability of Probatter

to meet the demand and the cost of developing a competing machine with comparable features at the time of the hypothetical negotiation cost-effectively, and not 13 years later with the benefit of technological advances and knowledge of the functioning of the Patents-in-Suit.

Here the evidence is that the Patents-in-Suit were embodied in a unique and highly praised product which was in high demand. There is nothing in the record which suggests Probatter lacked the manufacturing capacity or financial ability to meet the market demand, thus providing an incentive to grant a license on terms favorable to a licensee despite Probatter's financial distress at one point in time. Sports Tutor has presented no persuasive evidence that it could have invented dynamic breaking and manufactured a machine which could throw the array of pitches in rapid succession which Probatter's ball-throwing machine could throw, at the time of the hypothetical negotiation, much less at a cost-effective price in a timely manner. Consideration of this factor necessarily includes all relevant considerations made thus far and those considerations weigh in favor of Probatter.

C. <u>Summary and Conclusion on Reasonable Royalty Rate</u>

After carefully reviewing over fifteen years of pleadings, seven days of trial, the parties' post-trial briefs, and thousands of pages of exhibits, the Court makes the following findings.

There was very little empirical evidence to aid the Court in determining what the parties would have agreed to had they successfully negotiated a licensing agreement just before the infringement began.  Though the parties spent a great deal of time arguing that the only agreements they had to offer were comparable to

a license for the Patents-in-Suit, they were unpersuasive because none of the agreements was a license or a reasonable facsimile of a license.  The agreements presented were too unlike what the hypothetical negotiation would have yielded.

Despite the Court's skepticism, Probatter chose to change its measure of damages, foreclosing the designation of an expert because the oft-extended discovery deadline had expired.  In response to the Court's express skepticism that it could offer persuasive evidence of damages without an expert, Probatter insisted on seeking damages measured by the reasonable royalty method, and that it did not need a damages expert  because it was confident the court would be able to calculate damages based on the evidence it intended to present.

At this late date, reopening discovery on damages for a third time to allow Probatter a third bite at the apple would be prejudicial to Sports Tutor, which endured the litigation for longer than a decade.  Reopening discovery would be a waste of judicial resources, especially since the Court raised the issue at the time Probatter insisted on changing its measure of damages. Having raised the issue several years ago, there is no reason for the Court to believe reopening discovery would be fruitful and neither party has asked to conduct more discovery.

Without comparable licenses, without a credible expert calculation and explanation, and without a basis for determining how the patented features are valued, the parties have not offered so much as a starting point for the Court to quantify the damages to which Probatter is legally entitled.   That having been said, as an aggrieved party Probatter is entitled to some measure of damages.

The hypothetical negotiation likely would have resulted in a royalty rate rather than a lump sum up front payment.  That rate would not have been higher than 10%, which was Sports Tutor's profits on the infringing machine because the success of the infringing machines was not entirely attributable to the Patents-in-Suit.  The rate also would not have been higher than 7.5%, which was the simplified rate paid by Joyner for use of the much more valuable video patents.  Probatter would have had some leverage during the negotiation considering the amount of time it had remaining on the Patents-in-Suit and the utility of the Patents-in-Suit that Sports Tutor wished to incorporate in their pitching machines.  However, Sports Tutor also would have had leverage because Probatter was not successful in manufacturing a profitable ball-throwing machine incorporating the Patents-in-Suit and the best method of monetizing the Patents-in-Suit would be through engaging in a license agreement with a company capable of profiting.  Probatter would have been more inclined to enter into a license agreement with Sports Tutor because Sports Tutor was not its competitor and the license would not have impacted Probatter's core business of selling video simulators.  In fact, licensing the Patents-in-suit to Sports Tutor would have created another market for its flagship simulator. In addition, Sports Tutor would have likely secured a lower royalty because the license would have likely been non-exclusive or restrictive.

The Court ultimately finds that the hypothetical negotiation would have yielded a 3.5% royalty on the total revenue Sports Tutor received for selling the infringing machines.  This ultimate conclusion pulls from all of the considerations addressed above, by the parties in the briefing, and by the damages experts.  The

parties have stipulated that the total amount of sales of the infringing machine is $11,091.815.   Thus, the damages for infringement, prior to consideration of enhanced damages and prejudgment interest, is $388,213.53.

### III.   ENHANCED DAMAGES

The next issue before the Court is whether Sports Tutor should be subject to enhanced damages for the infringement.  Probatter seeks enhanced damages of three times the amount found because, *inter alia*, Sports Tutor knew of Probatter's patents and their validity but continued to utilize those patents for thirteen years to their benefit, only stopping when enjoined by the Court.  Sports Tutor argues that the damages should not be enhanced because, *inter alia*, Sports Tutor was not aware of the dynamic braking patents at the time of copying, and thus Probatter has not met its burden in proving subjective willfulness.

### A. Legal Standard

35 U.S.C. § 284 provides that "the court may increase the damages up to three times the amount found or assessed."  "A party seeking enhanced damages under § 284 bears the burden of proof by a preponderance of the evidence."  *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (citing to *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016)).

"[A]lthough there is no precise rule or formula for awarding damages under § 284, a district court's discretion should be exercised in light of the considerations underlying the grant of that discretion."  *Halo*, 136 S. Ct. at 1932 (internal quotation marks omitted).  As recently as 2016, the Supreme Court explained that over the last two centuries of discretionary enhanced damages awards, the channel for

exercising this discretion has narrowed reserving such damages for "egregious cases of culpable behavior," that is "beyond typical infringement." *Id.* at 1932, 1935. "The sort of conduct warranting enhanced damages has been variously described in [the Supreme Court] cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 1932. Even if a court finds egregious misconduct, the court is not required to afford enhanced damages. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1342 (Fed. Cir. 2016) (citing to *Halo*, 136 S. Ct. at 1933)).

In measuring culpability, the court is to consider "the knowledge of the actor at the time of the challenged conduct." *Halo*, 136 S. Ct. at 1933; *Polara Eng'g, Inc. v. Campbell Co.*, 894 F.3d 1339, 1354–55 (Fed. Cir. 2018).

Prior to the Court's ruling in *Halo*, the controlling standard was that under *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007), which required "at least a showing of objective recklessness." *Id.* at 1371. The Court in *Halo* rejected the objective recklessness standard. 136 S. Ct. at 1932; *WCM Indus., Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 969 (Fed. Cir. 2018). Rather, "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Halo Elecs., Inc.*, 136 S. Ct. at 1932.

Prior to *Halo*, the Federal Circuit provided a non-exclusive list of factors courts could use in determining whether to afford enhanced damages. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992). These factors are commonly referred to as the *Read* factors. The *Read* factors are:

    (1) whether the infringer deliberately copied the ideas or design of another;

    (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; . . .

    (3) the infringer's behavior as a party to the litigation; . . .

    (4) [the d]efendant's size and financial condition; . . .

    (5) [c]looseness of the case; . . .

    (6) [d]uration of defendant's misconduct; . . .

    (7) [r]emedial action by the defendant; . . .

    (8) [the d]efendant's motivation for harm; [and]  . . .

    (9) [w]hether [the] defendant attempted to conceal its misconduct . . . .

*Id.* (internal footnotes and citations omitted).

    "Because a finding of willful infringement does not command the enhancement of damages, the *Read* factors, although not mandatory, do assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages at all, and if so, by how much the damages should be increased." *WCM Indus., Inc.*, 721 F. App'x at 972 (citing to *Read Corp.*, 970 F.2d 816).  "Although the district court is not required to discuss the *Read* factors . . . it is obligated to explain the basis for the [enhanced damages] award, particularly where the maximum amount is imposed." *Polara Eng'g Inc*, 894 F.3d at 1355 (internal citations and quotation marks omitted).  In exercising its discretion, a district court should consider all relevant factors as they apply to the circumstances of each case. *Id.*

    While the *Read* factors are not exclusive nor required to be considered, the Court will consider the factors to assist in explaining the Court's rationale for granting enhanced damages and for the amount of enhanced damages being awarded.

B. <u>Analysis</u>

In order to determine willfulness, the Court must first determine what conduct the Court may consider in reaching this conclusion.  Sports Tutor argues that, because Probatter did not file for a preliminary injunction at any time in this suit, Sports Tutor's post-filing conduct is insufficient to establish willfulness.  To support this position, Sports Tutor cites to *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007), where the Federal Circuit states that "[a] patentee who does not attempt to stop an accused infringer's activities [by filing for a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct."  This citation comes from the Federal Circuit's discussion about what the appropriate scope of waiver of the attorney-client privilege when the advice of counsel is used to respond to a charge of willful infringement.  *Id.* at 1372–75.  The Federal Circuit did not cite to any authority supporting this proposition, nor was this proposition key to its conclusion on the unrelated issue.  It would appear this language is simply dicta, but other Courts have relied on this statement in determining enhanced damages.  *See Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, 759 F. Supp. 2d 387, 412–13 (S.D.N.Y. 2010).  However, even courts that apply this purported rule have found an exception when a patent survived reexamination proceedings without narrowed claims.  *Id.* at 412.  As discussed below, this exception would apply here.

Regardless, the Supreme Court in *Halo* was quite clear that *Seagate's* test for willfulness was unduly rigid.  *Halo*, 136 S. Ct. at 1932.  While the discussion in *Halo* was centered on the misguided "objective recklessness" requirement found

in *Seagate*, the policy behind *Halo* guides the Court's conclusion that a failure to seek preliminary injunction does not wholly remove any post-filing conduct from the Court's decision into willfulness.  However, the Court notes that other "courts have split on whether the prohibition for enhanced damages based solely on post-suit conduct remains" post-*Halo*.  *TecSec, Inc. v. Adobe, Inc.*, 1:10-cv-115, 2009 WL 1233882, at *1 (E.D. Va. Mar. 14, 2019) (collecting cases for both sides).

Based on *Halo* and the general reasoning stated in *Seagate*, the Court finds that it may take into consideration the fact that the patentee did not seek preliminary injunction when determining whether enhanced penalties are appropriate but the failure to seek such injunction does not prohibit the Court from considering post-filing conduct by the infringer.  This finding is consistent with *Read*, where the Court is directed to consider litigation conduct of the infringer.  *See Read Corp.*, 970 F.2d at 826–27.

The Court finds that Sports Tutor's willful misconduct rises to the level of the type of egregious case where enhanced damages are warranted.  The *Read* factors are helpful in organizing the evidence the Court considered in reaching this conclusion and are discussed below, but the *Read* factors merely guided the Court's analysis and were not dispositive on the Court's conclusion.  The conclusion is reached after considering all relevant facts and circumstances and finding that the infringing conduct was egregious beyond typical infringement.

### 1. Deliberate copying

The Court has previously found that Sports Tutor did copy Probatter's use of dynamic braking.  Dkt. 468 at 20.

> From 1991 until 2002, Sports Tutor did not manufacture a pitching machine with dynamic braking. ECF No. 455 at 196:15–198:14 (Greene Testimony). In January 2003, Sports Tutor's CEO attended a trade show where he saw the Probatter pitching machine being demonstrated. *Id.* at 197:24–198:10. When he first saw Probatter's pitching machine, Sports Tutor's CEO was admittedly "impressed," thought it was "pretty cool," and continues to believe that to this day. *Id.* at 198:15–199:1. Only after Sports Tutor's CEO saw Probatter's pitching machine at the trade show in January 2003 did Sports Tutor design its HomePlate machine with dynamic braking. *Id.* at 198:11–19; ECF No. 456 at 15:22–16:8 (Greene Testimony).

*Id.* This evidence collectively leads to the conclusion that Sports Tutor deliberately copied Probatter's patented technology.

However, whether and, if so, when Sports Tutor knew the braking feature was subject to Probatter's patents is in dispute. The prelitigation conduct between the parties is relevant to this discussion. Sports Tutor began selling the infringing machine in March 2003. Pellegrino Report at 10. Five months later, in August 2003, Probatter's legal counsel sent a letter to Sports Tutor where it introduced Probatter as the owner of several pitching machine patents, including the Patents-in-Suit. Pl.'s Ex. 9. The August 2003 letter indicates that Probatter recently became aware of Sports Tutor's "HomePlate" machine and based on Sports Tutor's website, said machine is covered by certain patents. *Id.* Probatter's counsel states that it searched for patents covering that machine independently to no avail and requested that Sports Tutor provide the patent number for the HomePlate machine along with any technical information or specifications. *Id.* The letter states that "[t]he purpose of this letter is to bring Probatter's patent portfolio to your attention. . . . If, after reviewing the attached material, you have any questions or would like to discuss the differences between the HomePlate machine and the Probatter®

pitching systems, we would be happy to speak with either you or your patent attorney at your convenience." *Id.*

Sports Tutor sent a response to Probatter's August 2003 letter approximately a month later.  Pl.'s Ex. 10.  In the letter, Sports Tutor directs Probatter to its Scott Patent and a 1989 patent ending in '060.  *Id.*  Then in November 2003, Plaintiff's counsel sent a letter to Sports Tutor's CEO that references a telephone call from September 2003, but the contents of that conversation were not provided to the Court.  Def.'s Ex. AA.  The letter did not discuss the Patents-in-Suit, rather focused on rumors that Sports Tutor was intending on competing in the video pitching machine market though Sports Tutor claimed it was not.  *Id.*  There is nothing in the record that shows the parties communicated with one another at any point thereafter until the instant litigation ensued two years later.

Sports Tutor argues that the August 2003 letter did not put it on notice that it was infringing on the patented features.  The Court rejects this argument.  As stated earlier, Sports Tutor deliberately copied the braking feature after viewing Probatter's machine at a trade show.  Sports Tutor was given copies of the Patents-in-Suit in August 2003, which included a patent for the dynamic braking.  Within a five-month period of deliberately copying the braking feature, Sports Tutor received a copy of the patent for the feature it copied.  Sports Tutor cannot now claim it did not know that it was infringing on the Patents-in-suit.   While it is possible that Sports Tutor did not know that it was deliberately copying the patents owned by Probatter at the time it manufactured the HomePlate Machine, at the very

least it knew it was infringing on the patents when it was sent copies of the Patents-in-Suit.

Deliberately copying a patent-protected feature leans in favor of affording enhanced damages because it exhibits a willful disregard for the rights of the patent holder.

### 2. Investigation Efforts and Good Faith Defenses

Sports Tutor's conduct following the notice of alleged infringement is relevant in determining the degree of culpability.  As stated above, after receiving the August 2003 letter, Sports Tutor sent a response attaching two if its patents. No other evidence was presented to show what other efforts Sports Tutor took to determine whether it was infringing on valid patents.  While the Court is prohibited by statute from considering the failure to seek or set forth as evidence of legal advice sought; § 298; there was no other evidence presented about other investigative efforts taken.  Sports Tutor's CEO testified that he did not believe they violated the Patents-in-Suit because he purchased the Scott Patent and tooling that included regenerative drives, which led him to believe he either did not violate the patent or that the patent would be invalidated due to prior art.  Tr. 7/14/2015 at 38. However, he also testified that the Scott Patent does not explicitly say anything about braking, let alone dynamic or regenerative braking.  Tr. 7/14/2015 at 39–40, 44.  There was no evidence presented that showed why Sports Tutor would think that the dynamic braking feature it saw for the first time in 2003 and copied was subject to its prior patents.  Therefore, Sports Tutor's CEO's claimed belief that it was not infringing on a valid patent is not credible.

Further, Sports Tutor did not seek reexamination of the Patents-in-Suit until 2008, approximately five years after the initial letter and three years after the instant litigation was brought.  Pl.'s Ex. 36.  The parties stipulated to the facts relating to reexamination as follows:

> In the Reexamination proceeding, the USPTO Reexamination Examiner issued final rejections of all claims of both Patents In Suit on June 18, 2010 (the '924 Patent) and June 18, 2010 (the '649 Patent). Plaintiff appealed the final rejections to the Patent Trial and Appeal Board, which reversed the USPTO Examiner, and did not find its claims to the combination of dynamic braking with a pitching machine unpatentable over the patents and printed publications considered of record.
> On February 14, 2012, Defendant filed two additional requests for Ex-Parte Reexaminations of both Patents. This time, the Examiner found no substantial new question of patentability in light of the patents and printed publications considered of record.
> As a result of these two rounds of Reexamination proceedings, two separate Reexamination Certificates were issued with claims 25, 26, and 27 of the '649 patent having been amended.

Dkt. 357-6.  The Court takes into consideration the fact that the USPTO Examiner originally rejected all claims of both Patents-in-Suit but was later reversed.  The initial rejection tends to support Sports Tutor's claim that it had a good faith defense to invalidity because it shows at least one USPTO examiner tended to agree with Sports Tutor.  However, this must be balanced against the fact that the Patent Trial and Appeal Board, this Court, and the Federal Circuit all found that such defense failed.  This evidence tends to slightly support enhanced damages.

### 3.  Litigation Conduct

In determining the degree of culpability, the conduct of the infringer during litigation may be relevant.  Probatter points to two types of conduct that it states supports a finding that Sports Tutor's conduct gives rise to enhanced damages.

Probatter first claims that all of Sports Tutor's six dispositive motions were denied, which it believes is proof of litigation misconduct. Instead of extensively summarizing the thousands of pages of pleadings relating to these motions, the Court will briefly reiterate the key takeaways from these dispositive motions.

The first dispositive motion filed by Sports Tutor was a motion to dismiss the "Second Cause of Action" of the complaint, wherein it claims that the second cause of action asserted under the Connecticut Unfair Trade Practices Act ("CUTPA") failed to state a claim upon which relief may be granted. Dkt. 20, 21. Judge Underhill, the presiding judge at the time, orally granted the motion to dismiss without prejudice to repleading the CUTPA count. Probatter filed an amended complaint approximately one month later. Dkt. 71.

The second dispositive motion filed by Sports Tutor was a motion for summary judgment generally asserting the invalidity of the Patents-in-Suit. Dkt. 50, 51. This motion was denied without prejudice in order to afford the parties the opportunity to revisit disputed issues of fact through continual discovery. Dkt. 127.

The third dispositive motion filed by Sports Tutor was a second motion to dismiss the second cause of action under CUTPA, with an "in the alternative" argument for a more definite statement. Dkt. 72. The Court denied this motion. Dkt. 125. The Court found that Sports Tutor's argument that it should be entitled to dismissal failed because it did not contest that the facts alleged, when taken as true, constitute a valid claim under CUTPA, a fundamental failure. *Id.* The Court also found that Sports Tutor's request for a more definite statement was not

required by Rule 8 and that Sports Tutor would have ample opportunity to investigate the factual basis for the CUTPA claim in discovery. *Id.*

The fourth dispositive motion filed by Sports Tutor was a second motion for summary judgment generally asserting the invalidity of the Patents-in-Suit and that judgment on the CUTPA claim should be entered in its favor. Dkt. 172. The Court denied this motion without prejudice to re-raising the motion after the conclusion of the reexamination proceedings before the PTO. Dkt. 200.

The fifth dispositive motion filed by Sports Tutor was a third motion for summary judgment generally asserting non-infringement. Dkt. 276. The Court denied this motion finding that Sports Tutors "only argument [wa]s meritless." Dkt. 439 at 3 n.2.

The sixth dispositive motion filed by Sports Tutor was a fourth motion for summary judgment generally asserting invalidity of the Patents-in-Suit because Sports Tutor alleged that dynamic braking had already been used on pitching machines. Dkt. 293. The Court denied this motion because Sports Tutor's 56(a)1 Statement was unusable as written and failed to establish there was no material undisputed fact obviating the need for a trial. Dkt. 467. In addition, the Court found that Sports Tutor's motion did not address certain elements necessary to determine invalidity. *Id.*

In summary, the case was poorly and inefficiently litigated. Some of the dispositive motions filed by Sports Tutor were meritless or procedurally improper. Other dispositive motions were dismissed on procedural grounds. These deficiencies do not rise to the level of litigation misconduct.

Probatter's second argument in establishing litigation misconduct on the part of Sports Tutor relates to evidence Sports Tutor set forth to "trick" the Court. This argument relates to conduct during the 2015 trial when Sports Tutor brought to the Court a pitching machine.  Sports Tutor's CEO testified unequivocally that the machine brought into the court for the trial was assembled in or around 1995 or 1996.  Tr. 7/14/2015 at 99. However, when asked about certain labels throughout the machine, it became clear that the machine could not have been fully assembled during that time period, rather it was assembled sometime after 2000.  *Id.* at 102–06.  The Court finds that Sports Tutor presented false evidence in an effort to manufacture a prior art defense.  Setting forth evidence that was clearly false in order to avoid liability is the kind of conduct that constitutes egregious behavior beyond mere infringement.  This was particularly egregious because Sports Tutor persistently contended that there was prior art, leave for which the Court afforded it repeatedly the opportunity to prove, bur sports Tutor never did.  On the day of reckoning, Sports Tutor offered into evidence at trial the ball-throwing machine which was patently not what Sports Tutor represented it to be.

The Court rejects Sports Tutor's argument that it did not engage in litigation misconduct because it was not subject to sanctions or Rule 11 motions.  Likewise, the Court's restraint does not mean misconduct did not occur.  Whether Probatter should have sought or would have received sanctions is not relevant to the determination of whether Sports Tutor engaged in litigation misconduct.  While evidence of sanctions would certainly provide additional evidence of litigation misconduct, Sports Tutor has presented no citation as to why prior sanctions

would be required.  Such a requirement would be counterproductive to the efficient adjudication of cases because it would require patentees to seek sanctions and then enhanced damages for the same conduct.  Sports Tutor has not provided to the Court any legal basis for imposing such a requirement.

Sports Tutor also argues that the Court should consider Probatter's litigation misconduct in mitigating enhanced damages, citing to *Power Mosfet Technologies, LLC v. Siemens AG*, 378 F.3d 1396, 1415 (Fed. Cir. 2004).  In *Power Mosfet*, the Federal Circuit states that, in the context of sanctions under Rule 11 and attorney fees under section 285, "[a] party subjected to behavior warranting an award of sanctions or fees might justifiably be denied those fees in a district court's discretion for the behavior to which it subjected others."  *Id. Power Mosfet* does not stand for the proposition that a patentee's litigation conduct must be considered for the purposes of enhanced damages under section 284.  Sports Tutor had the opportunity to seek sanctions and in fact did seek sanctions for Probatter's litigation misconduct.  *See* Dkt. 511, 512.[1]  The Court's decision is the law of the case on that issue. Sports Tutor is not entitled to benefit twice from the misconduct that the Court has already addressed.

*4.  Sports Tutor's Size and Financial Condition*

---

[1] **Sports Tutor filed a motion to exclude all evidence and argument concerning damages citing to Probatter's failure to provide in discovery the Sports Attack Agreement.  Dkt. 512.  Though Sports Tutor did not request monetary sanctions directly, it did request sanctions in the form of excluding all evidence on the issue of damages.  *Id.*  The Court afforded Sports Tutor sanctions, ordering Probatter to pay all reasonable legal fees and costs incurred by Sports Tutor in connection with the damages discovery relating to the Sports Attack Agreement.  Dkt. 535.**

The court in *Read* found that the infringer's size and financial condition is relevant in determining enhanced damages. *Read*, 970 F.2d at 827. In discussing this factor, the Court cited to *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 561 F. Supp. 512, 533 (E.D. La. 1982), *aff'd*, 761 F.2d 649 (Fed. Cir.), *cert. denied*, 474 U.S. 902 (1985) for the proposition that "[e]xemplary damages 'should not unduly prejudice the defendants' non-infringing business.'" *Read*, 970 F.2d at 827.

Probatter argues that Sports Tutor sells many other product lines and no evidence was introduced at trial to suggest its financial condition was weak. Sports Tutor states that it is a "modestly-sized company, with no evidence of financial distress" and concludes that this factor does not weight in favor of or against enhancement. The Court finds Sports Tutor has failed to show enhanced damages would not unduly prejudice its non-infringing business.

### 5. Closeness of the Case

The Federal Circuit has discussed some of the considerations relevant for determining the closeness of the case such as: whether infringement was based on the doctrine of equivalents rather than literal infringement; *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1376–77 (Fed. Cir. 2010); whether infringement was determined in pre-trial motions for summary judgment; *Id.*; and whether the overall evidence strongly support the patentee's case; *WCM Industries, Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 973 (Fed. Cir. 2018).

Here, the Court found literal infringement on a pre-trial motion for summary judgment. Dkt. 439 at 16–20. The evidence strongly supported Probatter's case on literal infringement considering that Sports Tutor's own CEO, consultant of

baseball, and expert all admitted that the infringing machine had all the elements of every purported infringed claim on the Patents-in-Suit. *Id.* at 16. The Court found that no genuine issue of material fact remained as to whether Sports Tutor literally infringed. *Id.* at 19. In addition, the Court rejected all of Sports Tutor's invalidity claims. Dkt 467 (holding that Sports Tutor failed to demonstrate invalidity); Dkt. 468 (holding that no claim at issue is invalid for obviousness). Sports Tutor appealed the Court's decisions on invalidity, which was affirmed by the Federal Circuit. Dkt. 471 (Notice of Appeal); 486 (Mandate). In the Federal Circuit's decision on the appeal, it found that "Sports Tutor did not satisfy [it's burden of proving obviousness] here because it failed to articulate a clear theory of obviousness." Fed. Cir. 16-1800, Dkt. 34-2 (Fed. Cir. Dec.). After reaching its conclusion, the Federal Circuit stated that: "Because we conclude that Sports Tutor failed to establish obviousness by clear and convincing evidence even without considering Probatter's contrary evidence, we need not address Probatter's evidence of objective indicia of nonobviousness." *Id.* at 9.

With that said, Sports Tutor is correct that after the infringement began and while this litigation was underway, a USPTO examiner rejected all claims of the Patents-in-Suit. That USPTO examiner concluded there was prior art that raised a substantial new question of patentability. Ex. 41 (Board of Patent Appeals decision summarizing examiners conclusions). Though this decision was later reversed on appeal, it does tend to show some closeness on the issue of invalidity. *Id.* However, the misjudgment of that examiner is to be tempered by the Boards

reversal of that decision, this Court's rejection of the invalidity defense, and the Federal Circuit's decision affirming this Court's decision.

Therefore, the Court finds that this case was not so close to justify no enhanced damages, yet not so clear to justify treble damages.

### 6. Duration of Misconduct

The next *Read* factor focuses on the duration of misconduct; where a long duration tends to support enhanced damages more than a short duration. Other Courts have found that a duration as short as 10 months and as long as 10 years have all weighed in favor of enhanced damages. *See PPC Broadband, Inc. v. Corning Optical Communications RF, Inc.*, Np. 5:11-cv-761, 2016 WL 6537977, at *8 (N.D.N.Y. Nov. 3, 2016) (finding ten years of misconduct weighed in favor of an enhancement) (citing to *I-Flow Corp. v. Apex Med. Tech., Inc.*, No. 07cv1200, 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) (finding six years of misconduct was "substantial," favoring enhancement); *Broadcom Corp. v. Qualcomm Inc.*, No. SACV 05-467-JVS, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [the infringer's] infringement (approximately two years), coupled with the fact that infringement continued after [the patentee] filed its suit, supports an increase in damages."), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007)). *See also Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 903 (E.D. Wis. 2017) (finding a period of five years pre-suit and three years post constituted a lengthy infringement); *Apple Inc. v. Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1034 (N.D. Cal. 2017) (finding a period of infringement of 10 to 12 months after being put on notice of the infringed upon patent weighs in favor of enhanced damages);

*Powell v. Home Depot U.S.A., Inc.*, 715 F. Supp. 2d 1285, 1298 (S.D. Fla. 2010), *aff'd*, 663 F.3d 1221 (Fed. Cir. 2011) (finding that four year infringement period weighed in favor of enhanced damages).  Some courts have found that "continuing to sell the infringing products after notice of infringement and during the course of litigation supports enhancement."  *PPC Broadband*, 2016 WL 6537977 at *8 (citing to *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 611 (D. Del. 2007)).

Here, Sports Tutor began infringing in March 2003.  However, the Court will only count the time in which Sports Tutor undoubtfully had notice of its infringement, which started with the August 2003 letter as discussed above.  The infringement ended when the Court enjoined the further sale of the infringing machine in March 2016.  The time between notice of infringement and the order enjoining future sales was over twelve years.  Consistent with the above cited case law, this duration of misconduct supports enhanced penalties.

### 7.  Remedial Efforts

The next *Read* factor suggests consideration of remedial efforts taken by the infringer.  In *Read*, the court cited to *Intra Corp. v. Hamar Laser Instruments, Inc.*, 662 F. Supp. 1420, 1439 (E.D. Mich. 1987), *aff'd without opinion*, 862 F.2d 320 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1021 (1989) in support of the conclusion that double damages was sufficient where the defendant "voluntarily ceased manufacture and sale of infringing systems during the pendency of this litigation."

Here, Sports Tutor's CEO testified in 2015 that Sports Tutor did not make any efforts to redesign the HomePlate machine to avoid infringing on Probatter's patents.  Tr. 7/14/15 at 28.  Not until the Court enjoined the future sale of the

HomePlate machine did Sports Tutor make an effort to redesigning the product so it no longer infringed on Probatter's patents.   Sports Tutor did not even begin this process of taking remedial efforts when it lost the appeal before the Patent Board.

In addition, for more than a decade Sports Tutor insisted it was not infringing because there existed prior art. It presented the purported prior art at trial. Assuming it did not intentionally commit a fraud on the court, it failed to even cursorily examine the machine on which its claim rested.   The Court's cursory examination revealed the purported prior art did not exist at the time the infringement began or during much of the pendency of this case.

Therefore, the Court finds that Sports Tutors failure to take any remedial efforts supports enhanced damages.

### 8.  Motivation

The next *Read* factor suggests consideration of the infringer's motivation; where a motivation to harm the patentee would support enhanced damages.  *See Canon, Inc. v. Color Imaging, Inc.*, 292 F. Supp. 3d 1357, 1368–69 (N.D. Ga. 2018) (collecting cases).  When the infringer is a direct competitor, this factor generally weighs in favor of enhanced damages.  *See Polara Engineering, Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 993–94 (C.D. Cal. 2017), *aff'd in part vacated in part*, 894 F.3d 1339 (Fed. Cir. 2018).

Here, Sports Tutor and Probatter were not direct competitors.  Probatter operated in the video pitching machine marketplace primarily and Sports Tutor only sold pitching machines.  Probatter did not address this factor, let alone

present evidence that would tend to support a conclusion that Sports Tutor was motivated to harm Probatter by infringing on its patents.

Therefore, the Court finds that this factor weighs against awarding enhanced damages.

### 9. *Concealment*

The last *Read* factor suggests consideration of any efforts taken by the infringer to conceal their infringement; where evidence of concealment would support enhanced damages. Here, there is no evidence Sports Tutor tried to conceal the infringement. Rather it is clear that they put their product and the infringement in the open marketplace, which allowed Probatter to quickly pick up on the infringement within months of the product entering the marketplace.

Therefore, the Court finds that this factor weighs against awarding enhanced damages.

### C. Conclusion

The Court has carefully reviewed the arguments presented by the parties, which wholly relied on the framework of *Read* as outlined above. Though the Court followed the *Read* framework, as did the parties, it considered all evidence presented in the parties' briefing and throughout the case.

After careful review of the arguments presented by the parties and the evidence available to the Court, the Court finds that Probatter has established by a preponderance of the evidence that Sports Tutor willfully, intentionally, and knowingly infringed on Probatter's patents. The infringement was deliberate.

Sports Tutor benefited from the use of this patent for over twelve years after receiving notice that it was infringing upon Probatter's patents and did nothing to remediate the infringement until enjoined by the Court.  Though Sports Tutor claims to have had a good faith defense, such defense was unreasonable at best, as it was only supported by a single USPTO examiner and rejected by the appeal board, this Court, and the Federal Circuit and soundly refuted by Sports Tutor's physical evidence of a ball-throwing machine which was patently not prior art.

Sports Tutor has on multiple occasions filed pleadings in this case that were meritless or so substantially procedurally improper that the Court was unable to reach an issue on the merits.  Sports Tutor presented knowingly false evidence to the Court in an attempt to manufacture its invalidity defense.

Sports Tutor is capable of withstanding enhanced damages as a modestly sized company with no evidence of financial distress.

With that said, this case was not so close to justify no enhanced damages but not so clear to justify treble damages either.  Further, there is no evidence that Sports Tutor was motivated to harm Probatter nor evidence that Sports Tutor tried to conceal the infringement.

Therefore, the Court finds that double damages is appropriate under the facts of this case.

## IV.    PREJUDGMENT INTEREST

### A. <u>Legal Standard</u>

The Supreme Court has said that:

prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the

**patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment.**

*Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, (1983) (internal footnote omitted).

When prejudgment interest is appropriate, it is within the court's discretion on how much to award in prejudgment interest. *Id.* at 656–57; *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986) ("The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court."). "In exercising that discretion, however, the district court must be guided by the purpose of prejudgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.'" *Bio-Rad Labs*, 807 F.2d at 969.

Prejudgment interest requests generally come down to the higher-prime rate or the lower-T-Bill rate. While some courts have discussed evidence that a patentee borrowed at the prime rate as relevant to determining the appropriate prejudgment interest rate; *see Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (discussing trial court's finding of a lack of evidence that the plaintiff borrowed money at a higher rate when affirming prejudgment interest at T-Bill rate compounded annually); *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 136 (D.N.J. 2007) (collecting cases); "it is not necessary that a patentee demonstrate

that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *see also Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.*, 862 F.2d 1564, 1579 (Fed. Cir. 1988).

"District courts have discretion to limit prejudgment interest where, for example, the patent owner has caused undue delay in the lawsuit . . . but there must be a justification bearing a relationship to the award." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988). *See also Gen. Motors Corp.*, 461 U.S. at 657; *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 913 F. Supp. 1256, 1282–83 (N.D. Iowa 1996).

Prejudgment interest is generally awarded from the date of the infringement to the date of judgment absent justification otherwise. *Nickson Industries*, 847 F.2d 800–01 (remanding judgment on prejudgment interest from date of filing rather than date of infringement because the trial court did not articulate justification).

Further, "[p]rejudgment interest cannot be assessed on the increased or punitive portion of the damage award." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983).

B. <u>Analysis</u>

Probatter argues that the Court should afford prejudgment interest at the prime rate, arguing that the Court should consider the evidence that it had borrowed money at a far higher interest rate in awarding a prime rate, citing to *Lam*, 718 F.2d at 1066. Sports Tutor argues that Probatter failed to prove its borrowing history at trial, other than a personal loan from its owner and made no effort to

prove a causal connection between any borrowing and loss of use of the money award in issued.  Sports Tutor argues prejudgment interest on the award should be calculated at the 1-year T-Bill rate, compounded annually.

In *Uniroyal*, the Federal Circuit affirmed a prejudgment interest rate award at the prime rate compounded daily based on the district court's finding that "(1) the litigation was, by patent case standards, of a protracted and comprehensive nature, and (2) [the patentee's] poor financial condition during the pendency of the litigation required it to finance its operations with monies borrowed at rates above the prime rate."  939 F.2d at 1545.

The case is analogous to *Uniroyal* because this litigation was protracted and comprehensive.  While the delay in adjudication of this case is in part due to Probatter, who, as explained above, unjustifiably changed the theory of damages shortly before the case was scheduled for trial.  However, the delay was in part due to Sports Tutor, who filed multiple meritless pleadings.

More importantly, this case is analogous to *Uniroyal* because there is evidence Probatter was in a poor financial condition around the time of the hypothetical negotiation.  That evidence is the Battersby Security Agreement discussed above.  As previously explained, in January 2002—approximately fourteen months before infringement—Greg Battersby, a then-partial owner of Probatter, loaned $100,000 to Probatter secured by Probatter's assets and proceeds.  The interest rate on this loan was 12%, which was approximately three

times the average prime rate in 2002.[2]   The Guarantee and Indemnification Agreement that accompanying the Battersby Security Agreement states "Probatter is unable to meet its obligation to refinance an existing loan in the amount of $100,000 to Cornerstone Bank . . . that has been guaranteed by Battersby and Charles Grimes."  Def.'s Ex. DB.  Though Battersby was an insider, which in some circumstances would warrant a finding that the agreement is not a reliable basis for showing what Probatter could have borrowed money for at the time, the more important evidence from the Battersby Security Agreement shows that Probatter was insolvent and having difficulty meeting its obligations.  This tends to show that Probatter was in poor financial condition.  Sports Tutor did not rebut this evidence of poor financial condition.  Thus, the only evidence before the Court on this issue is the Battersby Security Agreement, which demonstrates Probatter's poor financial condition.  Probatter had to borrow money at rates much higher than the T-Bill rate in order to meet its obligations.  Prejudgment interest at the T-Bill rate would fail to place Probatter in as good a position as it would have been had it received the licensing fee at the time of the hypothetical negotiation.

Therefore, for the above reasons, the Court finds that the appropriate prejudgment interest award in this case is at the prime rate to be compounded annually and applied to only the damages award of $388,213.53 beginning on the date of the infringement, March 12, 2003.

---

[2] According to the Federal Reserve, the average prime rate in 2002 was between 4.25 and 4.75%. *See* 1.33 Prime Rate Charged by Banks, Short-Term Business Loans, The Federal Reserve Board, available at: https://www.federalreserve.gov/pubs/supplement/2004/01/table1_33.htm#2002 (Jan. 2004).

## V.      CONCLUSION

After consideration of all the pleadings and arguments raised by the parties at the trial on damages, the Court makes the following conclusions. The reasonable royalty for the use made of the Patents-in-Suit is $388,213.53, which represents a reasonable approximation of what the parties would have agreed to in a hypothetical negotiation to license the Patents-in-Suit immediately prior to the infringement.  Probatter is entitled to enhanced damages, representing double the damages awarded, for a total of $776,427.05.  Sports Tutor is responsible for prejudgment interest on the reasonable royalty at the prime rate to be compounded annually beginning from March 12, 2003.  The prejudgment interest only applies to the reasonable royalty damages. This is imminently fair as the Prime Rate is lower now than it was during the majority of the time Sprots Tutor infringed Probatter's patent.[3]

The Clerk is to enter judgment in favor of Probatter.


IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated this day in Hartford, Connecticut: February 18, 2022

---

[3] *Selected Interest Rates*, FederalReserve.gov, available at: https://www.federalreserve.gov/releases/h15/ (last visited Feb. 18, 2022) (prime rate for February 2022 is 3.25%) *compare 1.33 Prime Rate Charged by Banks, Short-Term Business Loans*, FederalReserve.Gov, available at: https://www.federalreserve.gov/pubs/supplement/2008/01/table1_33.htm#per_year (last visited Feb. 18, 2022) (prime rate between November 6, 2002 and June 26, 2003 was 4.0%).